# APPENDIX.

## The Tide Water Canal Company *vs.* Ann Archer.
### *Harford County Court.—May term,* 1839.

It is settled in this state, that the power to take private property for public uses, upon making just compensation, may be exercised for the benefit of the public, by individuals, or by corporations, upon whom the legislature has, within proper limitations, conferred the power so to exercise it.

In construing statutes giving powers, that are to be applied to a great public object, depending for its success upon the judgment of the officers entrusted with its execution, and in whom there must of necessity be vested large discretionary powers, the interpretation should be liberal.

Care should be taken on the one hand, to secure to the individual whose property is appropriated to the public, a just and reasonable compensation; and on the other, that the objects contemplated by the grant of the powers, shall not be defeated, or embarrassed.

A jury summoned under the Act of 1825, ch. 180, to assess the amount of damages sustained by the owners of property, though at liberty to enlighten their own judgments by the testimony of others, are not, as juries in ordinary civil and criminal cases are, bound by the weight of evidence.

They may be governed greatly by the "view" which they take of the lands to be valued by them, when they meet thereon.

In determining questions of fact, in which the verdict of an ordinary jury would never be disturbed, if justified by the weight of the evidence, their decision would be open upon review by the court.

In cases arising under this statute, and other kindred ones, the reviewing tribunal may hear new testimony, as good cause against the inquisition, and set it aside upon such new evidence, though upon the proof submitted to the jury the verdict was right.

The proceedings of a jury empanelled under this law, and others of a like nature, are not to be regarded as those of a common law jury, and the jurors who signed the inquisition, may be examined as witnesses, as to the grounds and motives of their finding; in order to ascertain whether their verdict is not the result of mistake in the facts, as well as the law.

That the sheriff who summoned the jury, may have been partial to, or prejudiced in favour of one of the parties to the controversy, is not *per se* sufficient to set aside the inquisition, if it appears that no injustice has been done to any one.

The Tide Water Canal Co. *vs.* Archer.—1839.

The objection, that a juror is related to the parties, or interested in the land to be condemned, should be taken by way of challenge, before he is sworn, and comes too late, upon a motion to vacate the inquisition.

In cases of inquisition, to condemn property under this law, and others of a like nature, all the papers returned by the sheriff are to be regarded as one whole, each constituting a part of the other, and to be construed together, as a record of the proceedings.

The inquisition itself, need not assert upon its face, that the sheriff administered an oath to every juryman.

It is sufficient if the fact appears by his return, and the very language of the oath prescribed by the statute need not be followed, if the substance is preserved.

If other persons, beside the particular proprietor in the case, have an interest in the land condemned, it is not a valid objection, that such interests do not appear upon the face of the inquisition.

Where an appeal is allowed by law from the finding of the jury, and upon such appeal, the case is to be tried *de novo*, as if no finding had taken place, it is not *laches* in either party, that he offered no evidence, or forbore to offer all his evidence upon the first trial,—and if the law granting the appeal is repealed before the appeal is heard, that does not deprive the party in shewing cause against the inquisition, in the original court of the privilege of offering the proof, which he omitted before, relying upon his right of appeal.

It is not necessary that the jury in their inquisition, should describe the lands by metes and bounds.—If the description is such as to enable the party to make a true location, it is sufficient; and as in cases of deeds of conveyance, and inquisitions in the nature of *ad quod damnum;* matters in *pais*, may be resorted to, to arrive at the true location.

But where the first line of a parcel of land was described, as "beginning at the lands of H. S. and running thence down the Canal, and parallel thereto," and no natural boundary, plat or diagram was referred to, as designating the spot, at which the starting point on the lands of H. S. was situated, the description was held insufficient, and incurable by a resort to extrinsic circumstances.

The court in a proceeding of this kind, has no jurisdiction to correct the description, except by consent of parties.—Nor would the tender of a deed by the land proprietor, correcting the description, but refused by the other party, vary the case; and it *seems* that either party, may take advantage of the defect.

If the party in possession of the land have but a life estate, and the jury condemn it in perpetuity, and allow damages as for a fee simple, the whole estate is bound by the inquisition, though notice is only given to the party in possession, the owner for life, and the proprietor of the fee may get his proportion of the damages by applying to chancery for a distribution.

The rule by which damages are to be estimated, is in all cases a question of law, though the application of it is for the jury.

In estimating the value of property condemned for the public use, the jury should give the proprietor what, in their judgment, it would actually *at*

*the time,* sell for, and not what it might bring, or perhaps ought to produce, at some future period.

Possible or probable profits resulting from the enjoyment of the property, are not proper to be considered by the jury in making up their verdict; but they should limit themselves to the direct loss sustained by the owner, or other persons having an interest in the property sought to be condemned.

THIS case was argued at this term, before MAGRUDER and PURVIANCE, Judges.

By WM. SCHLEY and OTHO SCOTT, for the *Company,* and McMAHON and R. JOHNSON, for *Mrs. Archer.*

The nature and circumstances of the case are fully stated by the learned judges, before whom it was tried and decided.

THE questions now to be decided in this case, arise upon objections filed by the *Tide Water Canal Company,* to the affirmance of the inquisition returned to the clerk of this court by the late John Carsins, who was at the time of the taking and of the return thereof, the sheriff of Harford county, and the same having been taken on parcels of land alleged and stated in and by said inquisition, to be owned and claimed by *Mrs. Ann Archer* of said county. The objections are filed under a provision in the 13th section of the act of assembly of 1825, chapter 180, entitled "an act for the promotion of internal improvement," which section was ingrafted by the fourth section of the act of 1825, chapter 200, upon the charter of a company formerly called the "Susquehanna and Patapsco Canal Company," whose corporate name was changed by the third section of the act of 1835, chapter 340, and first section of 1835, chap. 356, by which enactments the company thereafter became, and was known and designated by the name and style of " *The Tide Water Canal Company.*" The 13th section of the act of 1825, chap. 180, after prescribing the manner in which the inquisition is to be taken, directs it when taken, to be returned by the sheriff to the clerk of his county, and then goes on to provide that " *unless good cause be shewn against the said inquisition,* it shall be affirmed by the court and re-

corded ; but if the said inquisition should be set aside, the said court may direct another inquisition to be taken in the manner above prescribed," &c. &c. It is under this provision that the *Canal Company* has offered its objections, and has alleged as cause why the inquisition should be set aside, not only that the damages allowed are excessive, but that there are many and various other grounds, all of which are set forth distinctly, and any of which, if sustained by the court, ought, as it is contended by the counsel of the company, to prevent the affirmance of the inquisition. It has not, heretofore, been the practice of the court, in cases arising under the acts of assembly authorizing the condemnation of private property for public purposes, to assign at length, their reasons for their decision. It has been their usual course, simply to affirm, or to set aside, as in the exercise of a sound discretion, it seemed best to them, the inquisition taken and returned to the court ; but as the case now under consideration, is one involving a large amount of money— affecting in its principles, many other cases now depending and awaiting its decision, and which it is most probable, cannot be finally settled until there is an adjudication upon the many questions which have been presented by the argument, to the consideration of the court—as it is one of a class of cases, in relation to which there have been several legislative enactments, and as moreover, it has been ably argued by the counsel of both parties respectively, it is, perhaps expected, but is, at any rate, fit and proper that reasons should be assigned for the decision now about to be made.

As most, if not all, of the objections set up by the *Canal Company* are founded upon the provisions of the 13th section of the act of 1825, chapter 180, and as much of the validity of those objections will depend upon the true construction of that section, it may be well, before we proceed to an examination of the several questions, to make a very few remarks upon the policy of that statute, and the object and intention of the legislature in passing it. The power of appropriating to public uses the property of any individual,

whenever the public exigencies require it, on the equitable and indispensable condition that such individual shall receive just compensation for his property so taken, has been heretofore decided in this case, in one of its earlier stages, to exist in the state, and has been conceded, in the argument, by all the counsel. This power, or as it is termed by the books, the right of " eminent domain" is inherent in every government. It has been settled in the judicial tribunals of every state in which the right to its exercise has come under review, to be a legitimate assertion of power by the legislature, in all cases in which they do not stop short of providing for compensation. And it is equally well settled now, and in this state certainly, that this right may be exercised for the benefit of the public by individuals, or by corporations, upon whom the legislature has, within proper limitations, conferred the power so to exercise it.

The " act for the promotion of internal improvement," (1825, chap. 180) was almost the commencement of those great undertakings, which in the language of one of our statutes (1824, chap. 79) was " to establish a connected navigation between the eastern and western states, so as to extend and multiply the means and facilities of internal commerce and personal intercourse between the two great sections of the United States, and to interweave more closely all the mutual interests and affections that are calculated to consolidate and perpetuate the vital principles of union." The legislature had previously created a board of public works, and had, in other respects, manifested a determination to prosecute with vigour, that great system of internal improvement which was to advance the prosperity and elevate the character of the state, and this act (1825, chap. 180) was a portion of the legislation which was necessary to carry out that system. In interpreting statutes which confer powers that are to be applied to a great public object, depending for its successful results upon decision of character and maturity of judgment in the officers and others entrusted with its execution, and in whom, from the very nature of the case, there

must necessarily be vested large powers, resting much for their exercise in discretion, and that discretion undefined, our construction ought to be benign and liberal—whilst on the one hand, we should regard these statutes as remedial acts, intended to carry into execution that most important and equitable provision in favour of private right, that whenever public necessity demands that the property of any individual should be appropriated to public uses, he shall receive a just and reasonable compensation therefor, and give to the expressions of the lawgiver the sense most suitable to the subject and best adapted to ensure to such individual the most liberal compensation for the damages he may sustain, we are, on the other hand, so to construe them as not only not to embarrass or defeat their purposes, but as far as we properly can, to facilitate and promote the success of a great and generous scheme of public policy. We are not to regard as wrong-doers or trespassers, those who in the execution of the work of public improvement, must necessarily come in conflict with private right, provided they act with good faith, and with sound common sense. Private rights of every description must give way upon such an occasion, to the permanent interest of the public, upon fair and reasonable compensation, otherwise it would be impossible to accomplish any scheme of internal improvement of any magnitude, involving heavy expense. The legislature having, in such cases, provided for the payment of compensation to the owner of private property whose individual rights have been impaired, whenever that is paid to the claimant of damages, the state succeeds to his right. The state becomes a purchaser; and the sole reason why the purchase is not one in fact and made in the ordinary way is, that the parties cannot agree upon a sale, for it is only " in case of disagreement," where there is a legal capacity to contract that the power to condemn by process of law, the lands wanted for public uses, is conferred by the state upon those whom it has constituted its representatives in carrying out the scheme of public policy.

With these principles or rules of interpretation for our

guidance, let us now consider the various objections which have been interposed by the *Canal Company*, as causes why the inquisition returned by the sheriff, in this case, ought not to be confirmed. The particular section under which the several questions growing out of these objections, arise (sec. 13 of 1825, chapter 180) is in the following words, viz: " And be it enacted, that it shall and may be lawful for the president and directors, or a majority of them, to agree with the owners of any land through or on which it is intended that the said canal or any of the works thereunto appertaining shall pass or be situated, for the purchase or use and occupation thereof, and in case of disagreement, or in case the owner thereof shall be a *feme covert*, under age, *noncompos*, or out of the state or county, on application to a justice of the peace of the county in which such land shall be, the said justice of the peace shall issue his warrant under his hand and seal, to the sheriff of the county, to summon a jury of eighteen inhabitants of his county, not related to the parties, nor in any manner interested, to meet on the land to be valued, at a day to be expressed in the warrant, not less than ten, nor more than twenty days thereafter; and the sheriff, upon receiving the said warrant, shall forthwith summon the said jury; and when met, shall administer an oath or affirmation to every juryman who shall appear, being not less than twelve in number, that he will faithfully, justly and impartially, value the land and all damages the owner thereof shall sustain by cutting the canal through such land, or the use or occupation for the purposes and period necessary, of such land, according to the best of his skill and judgment, and that in such valuation he will not spare any person for favour or affection, nor any person grieve for malice, hatred or ill-will; and in every such valuation and assessment of damages the jury shall be, and they are hereby instructed to consider, in determining and fixing the amount thereof, the actual benefit which will accrue to the owner from conducting the said canal through, or erecting any of the said works upon his land, and to regulate their verdict thereby, except

that no assessment shall require any such owner to pay or contribute any thing to the said company, where such benefit shall exceed in the estimate of the jury, the value and damages ascertained as aforesaid; and the inquisition thereupon taken, shall be signed by the sheriff and some twelve or more of the jury, and returned by the sheriff to the clerk of his county, and unless good cause be shewn against the said inquisition, it shall be affirmed by the court and recorded; but if the said inquisition should be set aside, or if, from any cause, no inquisition shall be returned to such court within a reasonable time, the said court may, at its discretion, as often as may be necessary, direct another inquisition to be taken in the manner above prescribed, and upon every such valuation, the jury is hereby directed to describe and ascertain the bounds of the land by them valued, and the quantity and duration of the interest and estate in the same, required by the said company for its use, and their valuation shall be conclusive upon all persons, and shall be paid by the said president and directors to the owner of the land or his legal representatives, and on payment thereof, the said company shall be seized of such land, as an absolute estate in perpetuity, or with such less quantity and duration of interest in the same, or subject to such partial or temporary use or occupation, as shall be required and described as aforesaid, as if conveyed by the owner of them," &c. &c.

The first objection which we shall consider is that which charges the late sheriff who returned this inquisition, with partiality to the proprietors of the lands taken under it, and with prejudice against the *Canal Company,* and with having acted in this behalf, under the influence of those feelings " in this, to wit: that he summoned particular persons to attend as jurors in this case, from his knowledge or belief, that said persons, as jurors, would be in favour of awarding high damages; and purposely omitted to summon certain other persons, as jurors, from his knowledge or belief that said omitted persons, if summoned and sworn as jurors, would not be in favour of awarding high damages; and also in

this, to wit : that at the time of summoning the jurors in this case, or some one or more of them, he openly advocated the giving of high damages to the proprietors by juries, and spoke in terms of reproach and disparagement of certain individuals, who had served on former juries, because such individuals had refused to sign some inquisition or inquisitions on the ground that the damages allowed, were, in their judgment, high and excessive ; and also in this, to wit : that on the day this inquisition was taken, and before the same was found, he urged upon the jury, or some one or more of them, that high and liberal damages ought to be given to the proprietors of lands, taken for the use of said company." Connected with this objection are several other additional ones, five in number, which charges the sheriff with corruption, as well as with prejudice and partiality, and which set out in detail the facts upon which the charges rest, and which facts are substantially embraced in the objection herein above recited.   In coming to the conclusion at which we have arrived on this point, it became necessary to consider and decide another question which was argued, and that was, whether the testimony of the jurors who found this inquisition, could be taken before the court on the whole subject of this review, or if not, then to what extent it could be received.   We do not intend to question, in the slightest degree, the authority of the case decided by the chief judge of this court, referred to in the argument, and which will be found reported in a note to the case of *Bosley vs. The Chesapeake Insurance Company,* 3 *Gill & Johns.* 473.   On the contrary, we think that decision, which was pronounced after a careful examination of the books, entitled to the same respect in which it is held by the profession, and which it has deservedly received from the reporters of the highest court in this state.   And the reasoning with which the learned judge sustains his opinion, is strong and founded upon sound sense, independent of the cases referred to by him as having been adjudicated by other tribunals.   He says that those decisions establish the principle " that no evidence can be received from

488 APPENDIX.

The Tide Water Canal Co. vs. Archer.—1839.

the jury to show mistake," and thinks "those decisions right, because were the law different, an inquisition might be instituted in every case, into the grounds and motives of a jury for their finding, in order to ascertain whether in coming to given conclusions, they had not mistaken facts. ˙ Verdicts of juries would then, in all cases, be uncertain. To permit such inquisitions into the motives of juries, would it appears to me," continues the judge, "be against public policy, and lead more frequently to the prostration of justice than to its preservation." The courts in England have also refused to receive the affidavits of jurors to explain the grounds of their verdict, and show that they intended something different from what they found. But the case in the note to 3 *Gill & Johns.* 473, just referred to, and it is believed also all the other cases in which the doctrine has been established which excludes the testimony of jurors, were instances of a common law jury, whose verdict is entitled to peculiar sanctity, and the rule rejecting the affidavits of jurors composing a panel of that species of jury, to impeach their verdict is strict, and rarely, if ever, departed from. (*Canal Bank of Albany vs. Mayor, &c. of Albany,* 9 *Wendell,* 254, & cases *ib. cit.*) There is one case, however, which was tried before a common law jury, wherein, after a careful review by the supreme court of New York, of all the authorities, the affidavits of two of the jurors were received, on a motion for a new trial, to show that in making up their verdict, they adopted a principle, in estimating damages, not allowed by law, (5 *Cowen,* 106, 121, *Sargent vs.* —— ——.) And the court there say that the affidavits may be received in the case before them, without impeaching the principle of either class of those cases which had passed under their review. It is true that in this last case, it is stated that the counsel for the plaintiff, in summing up, told the jury that they must find according to a principle which was afterwards, on hearing the motion for a new trial, disapproved by the court, and which not being corrected by the judge who presided at the trial below in his charge after the counsel had summed up, led the jury astray, and they in

consequence allowed in their verdict what was claimed upon an erroneous principle of law. The court say, "this is in effect, equivalent to a misdirection of the judges. It is clearly the duty of the court to interfere in such a case, if the facts come properly before them." So that even a common law jury may be allowed to testify as to their having, in making up their verdict, estimated the damages upon a principle erroneous in point of law. This decision may have some bearing upon another question in this case, hereafter to be considered.

In the view which we take of the nature, duties, and powers of the jury which is constituted by the 13th section of the act of 1825, chapter 180, we shall not, in any wise, disturb the rule which has been adopted by the decisions above adverted to. It seems to us that the legislature did not intend to throw around that jury all the attributes and rights of a common law jury, nor to confine it to the duties and limitations to which a common law jury is subjected. In performing the duties prescribed to him by the provisions of that section, the juryman is not to govern himself "according to the evidence" adduced in the cause, as a juror in ordinary cases, is sworn to do, but he is to act "according to the best of his skill and judgment." We do not mean to say, that in cases of this kind, the jury are prohibited from listening to testimony, because the practice in this state has been to do so, and the opinion of the chief justice of the supreme judicial court of Massachusetts pronounced in a case arising under a statute conferring upon a jury a similar power to *estimate upon view*, would seem fully to sustain that practice, (*Parks vs. Boston*, 15 *Pick.* 210,) Mr. Chief Justice *Shaw*, in delivering the opinion of the court in that case, says, "the locating committee, and the sheriff's jury, are to make an estimation upon view, and speaking for myself, I cannot," says the Judge, "perceive why they might not, in both cases, have estimated the damages upon their own experience and judgment, without any evidence *aliunde*, though they might be at liberty to enlighten their own judgments by the

aid of testimony." We only mean to say, that we think such a jury is not bound, as juries in ordinary civil and criminal cases are, by the weight of evidence—they may be governed greatly by the " *view* " which they take of the lands to be valued by them when they meet thereon, as they are not instructed upon questions of law, by a court, they may and probably often, and generally do, form and act upon their own opinions, or those of their presiding officer, as to the ·law, arising out of the facts before them, and in so far as they are correct in these opinions, their proceedings would be free from error; but still they are liable to err upon such points, not having, as jurors in ordinary trials always have, the aid of a court, which is peculiarly conversant with such subjects. It would occupy too much space to enter into details to show the difference which exists between a body of men proceeding under a law of this kind, and a common law jury—they are, it is true, authorized to examine, consider and settle, so far as they constitute a part of that entire tribunal·which is finally to settle them, great and important interests, and rights of property; but even in determining questions of fact, in which the decision of an ordinary jury would never be disturbed, provided it was justified by the weight of evidence, the verdict of a jury empannelled under the provisions of the statute we have been considering, would not be conclusive, although it might·be found according to the weight of evidence, but would be, even on that point, open upon review by the court. Such has been the practice in this state, it is believed, and it would seem to be sustained by the phraseology of the statute itself, because although in cases of ordinary. trials in courts, it might conflict with well·established rules to set aside upon testimony not produced at the trial a verdict right in itself upon the evidence which was submitted to the jury who rendered it, yet in cases arising under this statute and other kindred ones, the introduction of new testimony to enlighten the judgment of the reviewing tribunal, and which, if it had been heard by the jury who found the inquisition, might have led their minds to a different result,

would, if such testimony should materially alter the state of the controversy and the rights of the parties, be " good cause shewn against the said inquisition," and why it should not be affirmed by the court. We refer to a case already cited in this opinion, ( *Canal Bank of Albany vs. Mayor, &c. of Albany*, 9 *Wend.* 254, *et sequent.*) in which the marked distinction existing, in many respects, between a jury such as is constituted by our canal and rail road laws, and other similar *ad quod damnum* statutes, and a common law jury, is pointed out somewhat at length, and, according to our judgment, very correctly and precisely. There Mr. Justice *Nelson*, in delivering the opinion of the supreme court of New York, in page 255, remarks, " in this case (similar in its character, somewhat, to that we are now considering) there is nothing to characterize the twelve men empannelled as a jury, but the name and mode of selection." In page 254, after stating that he was not now disposed either to vindicate or impugn the rule rejecting the affidavits of jurors to impeach their verdicts, a rule which he admits is strict, and rarely departed from, he says, " there are cases both in our own and the English courts, in which appeals to the sense of justice of the courts, have excluded, if not overcome, the stubbornness of the rule. I admit," he says, " they are few, and do not intend to multiply them. It is enough that *the rule is exclusively applicable to a common law jury*, and is never applied or enforced where a body of men are substituted in their place, as in the case of arbitrations, referees, commissioners, &c. The principle applicable to a common law jury, *never could be endured in those cases*, and the grounds upon which it may be defended when confined to the verdict of the jury, do not exist here." He then gives a sketch of the proceedings of a common law jury—draws the distinction to which we have before alluded, between such a jury and that which is directed by statutes similar in their nature to that under which the jury in this case was empannelled—sets forth " the multiplied means of accurate information both in law and fact," which are accessible, and of

492 APPENDIX.

The Tide Water Canal Co. vs. Archer.—1839.

right belong to a common law jury—notices "the guards which have been cautiously and securely thrown around them to prevent extraneous influence or the knowledge of any fact except such as transpired in open court, all affording to the parties great security against error or mistake by the jury, and some foundation in reason for the policy of the rule which can exist in no other proceeding," and concludes in the emphatic language we have before transcribed, that "there is nothing to characterize the twelve men empannelled as a jury, but the name, and mode of selection." We are of the opinion that the proceedings of the jury who were empannelled in this case under the act of assembly, are not to be regarded as those of a common law jury, and therefore that the jurors who signed the inquisition, may be examined as witnesses upon all subjects whatever relating to this controversy, as fully as any other persons who might be sworn as witnesses in the cause—that they may be examined as to the grounds and motives for their finding, in order to ascertain whether in coming to their conclusions, they had not mistaken facts, as well as the law.

It is satisfactory to find that in the judicial district of our state, in which the learned and distinguished chief justice of Maryland resides, it has been decided in several cases, on the trial of objections to inquisitions taken before the sheriff for the condemnation of lands for the purposes of the Chesapeake and Ohio Canal Company, that jurors empannelled on the inquest may be sworn and examined as to the grounds of their inquisition, and may be permitted to give evidence of any facts and circumstances within their knowledge pertinent to the question under consideration, which others would be competent to prove. This constant and uniform practice of the judges of that district, who have had more experience upon such subjects, by reason of the many condemnations which have taken place at the instance of the Chesapeake and Ohio Canal Company, than has fallen to the lot of the members of any other judicial district in this state, would, of itself, and independent of the respect which is so justly due

to the members of that learned tribunal, be regarded as adding great weight to the authorities which have been referred to, in support of the opinion which we have expressed.

We approach next, the question as to the conduct of the sheriff, but before we consider that, it will be necessary to dispose of a preliminary objection which was interposed in the course of the argument, by the counsel for the land proprietor. It was contended that this objection, if it was known to the counsel of the *Canal Company* at the time that the jury met upon the land, and it is asserted that it was within their knowledge, ought to have been taken before the jury was sworn, and in support of this position the case of *Barre Turnpike Corporation vs. Appleton*, 2 *Pick.* 430, has been relied on. There, however, it was expressly provided by the statute under which the proceeding took place, that the jury to be empannelled should be summoned by the *sheriff* or his deputy, or if he, or either of his deputies, were a party, or interested, that the jury should be summoned by a coroner of the county. The court in that case (page 433) put their decision upon this provision in the statute, saying that "the proceedings in the case are strictly and exclusively regulated by statute, and it is not for us to question the propriety of any of the provisions upon the subject." There is no such provision in the act of assembly now under consideration, but on the contrary, no power is given to any person in that behalf but the sheriff, to whom alone is confided the duty of summoning the jury, and without some further legislative action, no one else could exercise such an authority. It would not be difficult to show that, however proper it might be under the Massachusetts statute to require such an objection to be made *in limine*, and before the empannelling of the jury (and we concede the correctness of the decision just referred to) such a course ought not to be exacted under the statute of Maryland, and we entertain no doubt, that if upon a review of the proceedings before this court, such a case of partiality or of prejudice, and *a fortiori* of corruption in the sheriff could be shewn, as would render it necessary for the

advancement of justice that the court should interpose, it would not now be too late for either of the parties, if their rights were affected by the misconduct of that officer, to claim such interposition. It would be, as we think, clearly " good cause against the said inquisition," within the fair intent and meaning of that provision of the statute which confers upon this court the authority to affirm or set aside the inquisition. But in the view which we take of this branch of the inquiry, it will be unnecessary to enlarge upon the subject further than to say, that this is an application to our discretion, and it must be treated as all applications of a similar character are now treated, according to the settled practice of the courts. On motions for new trials, not only in civil but in criminal cases, and some of them were capital, where jurors have been improperly put into the jury box, and have formed a portion of the panel which gave the verdict, the courts have refused to set aside such verdict, where there was no proof of any fraud on the part of the summoning officer, nor of collusion with any other person; and the reason is, that no injustice has been done to any body, that being the true subject of inquiry in all such cases. That a sheriff, or any other officer concerned in the administration of justice, should not only act with integrity, but should also be free from all partiality or prejudice, and wholly indifferent, is certainly demanded of him by the law, because if he were not so, great mischief might follow, and much injustice be done. But where it is clear to the courts that there is no ground to apprehend any such result as injustice to any party the reason of the law ceases. The courts endeavour always so to apply the law, as to effectuate justice. The case of *The King vs. Hunt, in 4 Barnw. & Ald.* 430, *S. C.* 6 *Sergt. & Lowb.* 476, states the true rule. Mr. Justice *Best*, there says, " taking it to be an application to our discretion, is it shewn that any injustice has been done? The true rule is this, if the officer has not done his duty, he is to be punished for it; and if his omission has actually produced prejudice to the party, then it is in the discretion of the court *to prevent injustice* being done,

by granting a new trial." In the case now under considera-
tion, the proof is abundant, that even had the sheriff been
partial, and prejudiced, or corrupt, no injury has in fact re-
sulted therefrom to the *Canal Company*, every member of the
jury who signed the inquisition, it is believed, has testified
that he was never approached directly or indirectly by the
sheriff, nor had any conversation with him upon the subject,
and that his verdict was rendered free from any influence of
that officer. If the sheriff had been guilty of any of the
charges brought against him, he would, as we think, have
been clearly liable to indictment, and if the proof taken be-
fore the court had not shewn conclusively to our minds, that
not the slightest prejudice had resulted to any party by reason
of the jury having been summoned and empannelled by him,
we should not have felt ourselves at liberty, at least in this
aspect of the case, to have concurred in an affirmance of the
inquisition. It is much to be regretted that a man, who,
from the proof in this cause, was one of undoubted integrity,
enjoying, at all times antecedent to the period of this alleged
offence, an unusual share of the confidence of his fellow-
citizens, and whose character had been theretofore free from
reproach, should, from any cause, whether at unguarded mo-
ments, or when probably under undue excitement, have so
expressed himself, as to have subjected his official conduct to
so strict a scrutiny, and in the course of a judicial proceed-
ing. It was painful to the court, during the investigation,
and it is almost equally so to be constrained now to advert to
it, as we have, from a sense of duty, briefly done. It is im-
possible that justice can be well administered, however pure
its fountains, if its officers, and especially one of such confi-
dential trust as a sheriff, be not incorruptible; and no tribu-
nal can properly be silent, however sensibly it may feel the
duty of noticing it, when there is the slightest apparent
ground for suspicion, and the same is brought to its judicial
consideration. It is, however, no more than an act of jus-
tice to the memory of the officer whose conduct has been
impeached before us, to say, that however indiscreet he may

have been in his expressions on some occasions, and what-
ever was, at the time of uttering them, the state of his feel-
ings towards the parties to this cause inferrible from the lan-
guage used by him, as proved by some of the witnesses, we
feel bound from the whole evidence, to say that although his
language was, at times censurable, we see nothing criminal
in acts or intention, and we acquit him of all corruption, and
of any reprehensible partiality or prejudice which influenced
his official conduct in this case—and we are entirely satisfied,
that on this score, no injustice has been done in the finding
of the inquisition.

The next objection made, is to the competency of the
jurors, in many respects; that some one or more of them had
formed and expressed an opinion upon the merits of this case
before the jury was empannelled—that several of them were
incompetent by law to act in this case, being related within
the limited degrees of consanguinity or affinity to the pro-
prietors of other lands required for the use of the *Canal Com-
pany*, lying in Harford county, and thereafter to be valued, in
which the same question or some of the same questions would
arise, and would be considered and determined in making the
valuation and assessment of damages in those cases, as arose,
and as were to be, and were considered and determined by
the jury in this case—and that several jurors who are named
in the objection, and who were summoned by the sheriff to
attend on the lands to be valued in this case, were, or some
one of them was, related to the said *Mrs. Ann Archer*, within
the limited degrees, and so incompetent persons to serve as
jurors in the case; and so the sheriff did not, as by the war-
rant to him issued he was commanded, summon a jury of
eighteen inhabitants of his county not related to the parties,
nor in any manner interested, to meet on the land to be
valued. We have said, in a former part of this opinion, that
in the interpretation of statutes which confer powers that are
to be applied to a great public object, courts ought so to
construe them, as not only not to embarrass or defeat their
purposes, but as far as they properly can, to facilitate, and

promote the success of a great public undertaking. Now it is true that the statute we are considering, confers special powers and upon a new jurisdiction, and falls within a well established principle of law, that it must, in that behalf, be construed strictly—that these powers must be exercised according to the course prescribed by the statute. We do not think that we at all conflict with this principle, in over-ruling this objection, made, as it is, at this late stage of the proceedings. We are clearly of opinion, that should such an objection be sustained, if there would not be a failure of justice, there would be so many difficulties and embarrassments growing out of it, as would nearly, if not altogether defeat the purposes of the act of assembly. By the provision of the statute, there is ample time allowed from the date of the warrant to the sheriff, who is directed *forthwith* to summon the jury, to every person having an interest in the controversy, to inform himself as to the requisite qualifications of all who are summoned as jurors, and there is no just reason, as we conceive, why a party should not avail himself of such objection, by way of challenge before a juror is sworn, as he would undoubtedly be obliged to do, in the case of a common law jury. The object of this provision of the statute is the same as the law requires in relation to a common law jury, that is to say, that the jurors shall be perfectly disinterested, impartial and free from all exception, and the rules which have been adopted as to challenges, ought, therefore, to be applicable to all juries. That it is the policy of our statutes regulating the qualifications of jurors (1715, *chap*. 37, *and* 1798, *chap*. 21, *sec*. 2) to require an objection to a juror to be made by challenge before he is sworn, is evident we think, upon their face, and that it can only be taken in that mode, is settled by a series of adjudications in England and elsewhere. (11 *East.* 231, *note*, "*the case of a Juryman,*" *sometimes called* 12 *East.* *Rex vs. Tremain,* 16 *Sergt. & Lowb.* 319. 7 *Cowan,* 478. 9 *Johns.* 261. 6 *Wend.* 389.) It is the duty of the parties interested, to make diligent inquiry as to the qualifications of jurors, if they mean to except to their

competency, and they have the right to examine, on his *voire dire,* the juryman excepted to, or otherwise to satisfy the sheriff that such person is not properly qualified. (15 *Johns.* 179, *Merserau vs. Norton.* 6 *Wend.* 389, *The People vs. Jewett.* 11 *Pick.* 274, *Merrill vs. Inhabitants of Berkshire.* 9 *Wend.* 231, *Roach vs. Cosine.*) In one of these cases, the jury was sworn by the sheriff out of court, to assess damages where there had been judgment by default, (15 *Johns.* 179) and the court said, that if there be a legal and valid objection to a juror, " the sheriff may set aside the juror against whom the objection is made, and summon another, *or if he should refuse to do so, it would be ground for an application to set aside the inquisition.*" In another, (11 *Pick.* 274,) which was a proceeding under statutes authorizing the condemnation of lands for a highway, and, of course, similar, in some respects, to the case now before us, the supreme court of Massachusetts say, " it is the duty of the officer (sheriff) not only to summon the jury, but to preside at the trial, *to decide upon challenges and excuses of jurors,* and to determine the competency of witnesses, the admissibility of evidence, and other incidental questions arising in the course of the trial." And in another (9 *Wend.* 228, 231, *Roach vs. Cosine*) where there was a proceeding under a statute regulating *summary proceedings* to recover the possession of land, and where the justice who issued a *venire* for the summoning of a jury, issued a second *venire* because of a sufficient number of jurors not appearing at the return thereof, although it was objected by one of the parties that he had no authority to do so, and where he subsequently, there still being a default of jurors, issued a third and fourth *venire,* on the return of which, the jurors appearing, they were empannelled, the supreme court of New York say, (*page* 231,) "the officer must necessarily have the power of renewing the *venire* until a jury appears, otherwise there would be a failure of justice. It is a power incident to that of conducting an inquiry by means of a jury." So that, in this respect, the law is the same as to all juries, the reason of the law being, in all such cases, the same. We

entertain no doubt that all these objections to the jury which was empannelled in this case, come too late; not having been taken by way of challenge, they cannot now be allowed, and ought to be over-ruled. In support of this opinion, see the following cases: *Ramadge vs. Ryan,* 9 *Bingh.* 333. *S. C.* 23 *Serg. & Lowb.* 296. *Jefferis vs. Randall,* 14 *Mass.* 205. *Rex vs. Sutton, et al,* 8 *Barnw. & Cross,* 417. *S. C.* 15 *Serg. & Lowb.* 253. *Amherst vs. Hadley,* 1 *Pick.* 38, 43. *Mima Queen and child vs. Hepburn,* 7 *Cranch,* 297. *Hollingsworth vs. Duane,* 4 *Dale.* 353. *Onions vs. Naigh,* 7 *Price's Exchq. Rep.* 203. 7 *Law Lib.* 161. 6 *Greenleaf,* 307, 329, *McClellan & Crofton.* 3 *Greenleaf,* 215, *Walker vs. Green.*

It is further objected, that illegal and improper evidence was given to the jury, on the part of the land proprietor in this case, and which the said company, as it is alleged, had no means or power to prevent, and that the jury were misdirected and misled, in matters of law, by statements and assertions of the counsel of the proprietor and others, as to the rights of said proprietor, and as to the duty of the jury in the premises, and as to the rights, obligations, privileges and franchises of the *Canal Company,* and that these statements and assertions, although erroneous and unfounded, were accredited, believed and acted upon by the jury, or by some of the jurors, and which statements and assertions, the *Canal Company* had no adequate means to countervail or correct before the jury. That unjust and improper means were used, to influence the jury to give high and excessive damages against the *Canal Company,* such as creating the belief and impression that all jurors, who were not in favour of high damages, were unfriendly to the land-owners, and thereby inducing the jury to believe, that if they did not give high damages, the land-owners would regard them as personal enemies; and also creating the belief and impression among the jury, that they would be regarded as illiberal and ungenerous, and be subjected to the odium of their neighbours, if they did not give good damages, and that it was also stated

to the jury that they ought to take care of the people; that a corporation of foreigners were taking their lands against their wishes and consent, and ought to be made to pay for it—and that the jury were urged by persons acting for, and on behalf of the land-holders, to give high damages on the ground that the said corporation had a right to appeal, and would exercise it, and that the jury, in their valuation and assessment of damages, took into consideration as a ground of damage, that the *Canal Company* had, at that time, such right to appeal, and a further right to remove said appeal for trial to Baltimore county court, and acted upon the assumption that said company would exercise those rights, and thereby subject the said proprietor to the grievance and inconvenience of attending upon the courts, and to the loss of time and expense of attending in Baltimore city, in person, and with her witnesses, and to the apprehended large and onerous charges to which, it was surmised, she would be subjected in the retainer and employment of counsel to maintain and vindicate her rights, as well in Baltimore county court, as in the court of Appeals, if the case should eventually be carried thither; and that the jury were told by the counsel of the land-holders, that they had no right to take into consideration, in fixing the amount of damages, any advantages which the canal might be to the land-holder.

In relation to almost all these objections, it is sufficient to say that no evidence having been adduced in support of them, so far as we have any recollection, or as derivable from our notes of the testimony, they fall to the ground, of course. As respects any misdirection in matters of law, or misconception of the jury upon that point, or as to the admission of illegal and improper evidence, it may be fit to advert to that portion of this objection, and we shall do so when the question as to the allowance of excessive damages in this case, comes to be considered in its due order. In relation to all other portions of this objection, we consider them as not tenable, because unsupported by evidence—indeed they were not, as we think, much, if at all relied on, in the argument.

It is further objected that the inquisition does not appear to have been, and in fact is not, *signed* by the said sheriff, before whom it purports to have been taken; whereas, by the express directions of law, as it is contended, the inquisition ought to have been signed by the said sheriff and some twelve or more of the jury. And it is also objected, that in his return of said inquisition to the clerk of Harford county court, it is not set forth or stated, that the said inquisition so taken before him, was signed by him, the said sheriff. These objections are founded upon the well known and admitted principle, that proceedings before a tribunal of limited jurisdiction, or under requisitions particularly described by a statute, must appear on the face of the record of such proceedings, to have been strictly complied with. It is contended that the record does not show the fact of the signing of the inquisition by the sheriff, either upon that instrument itself, or by the return of that officer filed among the proceedings. It cannot be doubted, that this *signing* by the sheriff, if it be such an one as is within the meaning of the law, might have been made, with more accuracy, and it would be well, in all such cases, to avoid difficulty as to matter apparently of form only, but often of substance, by following the precedents set forth in the books. Let us, however, examine, whether in a case of this kind, requiring as it does, all the strictness of construction which would be applied even to the summary proceedings under our attachment laws, the form prescribed by the statute has not been complied with. In *Shivers vs. Wilson*, 5 *Har. & Johns.* 132, which was a proceeding under these laws, and one of a series of cases in the court of Appeals of our own state establishing much rigour in relation to the necessity of adhering strictly to form, the late Chancellor *Johnson*, then a judge of that court, says, in delivering its opinion, " no principle of law is more evident, than that where the tribunal is of a limited jurisdiction, or the proceedings are particularly described by a statute made on the subject, that course of procedure so described, must on the face of the record, appear to have been, if not literally, at least

*substantially*, complied with." Now in order to determine whether the meaning and object of the statute has been gratified, we must first ascertain what is that meaning, as was done in the case of *Higdon vs. Thomas*, 5 *Har. & Johns.* 139, in which the same court decided that under the fourth and fifth sections of the statute of frauds, (which sections, they say, are, as it respects " signing," substantially the same) a technical authentication by signature, is not necessary, but that if the name of the party appears in the memorandum of a contract, and is applicable to the whole substance of the writing, and is put there by him, or by his authority, it is immaterial in what part of the instrument the name appears, whether at the top, in the middle, or at the bottom, forms not being regarded, provided the statute is satisfied. And in the *State use Williamson vs. Levy*, 3 *Har. & McHen.* 592, where a commission had been issued to take testimony, and the commissioners who signed their names to the return of the commission with the accompanying depositions, had neglected to put their seals, and an objection being taken that it did not appear from the face of any of the proceedings, that the seals of the commissioners were affixed to any part of the commission or its enclosure, the general court held, and the decision was afterwards affirmed by the court of Appeals, that the commission being enclosed in a *cover* directed to the judges of the general court, with the names of the acting commissioners written by themselves on the said cover, and their seals annexed to their names respectively, and having been delivered in a legal and proper manner to one of the clerks of the general court, the testimony taken under it, was properly allowed to go to the jury. It is scarcely necessary to remark, that in cases of this nature, great strictness and accuracy are required, and yet that was held to be a sufficient *sealing* by the commissioners, within the meaning of the mandate of the court which required *the commission* to be returned under their hands and seals, it being *substantially* a sealing.

The object of the statute before us, in requiring the sheriff

to sign the inquisition was, that his name should give authenticity to the whole instrument, because, in directing that it should be signed by him, " and some twelve or more of the jury," it certainly was not intended that his concurrence with them in the finding of the inquisition, was necessary to give it validity. The signatures of the jury who were sworn to assess the damages, made it effectual as to the finding, and the signing and return by the sheriff of the instrument containing that finding, was only necessary to give such authenticity to it as the statute required. If we test the meaning of the word " signed," as applicable to the jurors who found the inquisition, by putting the case of a juryman's name being signed by another person by his authority, in consequence of his being rendered unable to sign the inquisition himself, by reason of some physical disability occurring during the trial, subsequently to his being sworn, and before the rendition of the verdict in which he had concurred, it would be difficult to assert, either in reason, or in the face of decisions in analagous cases, that such was not a signing, within the intent of the law. Besides, no particular day, or time, is prescribed by the statute, at which the jury and the sheriff, are to sign, and although the practice, and a proper one it is certainly, has been, for the jury to sign at the time of the finding, yet the law being silent on the subject, it might be contended, with some show of reason at least, that the signatures might be put on any day before the actual return of the paper, or inquisition, to the clerk of the county. Suppose the sheriff had written upon the inquisition, or paper containing it, immediately under the names of the jurors who signed it, a certificate that it was taken before him, reduced to writing and signed by the jurors in his presence, and had signed his name to such certificate, could it be reasonably said that the sheriff had not " signed " *the Inquisition?*—Suppose he had simply written underneath, or opposite to the names of the jurors, or any where upon the inquisition, the words " taken before, and certified by me, John Carsins, sheriff of Harford county," it would be difficult to contend that such would not be a *signing*

by that officer, within the import of the statute. If he had done no more than to write his name as sheriff on the paper containing the inquisition, that, as it seems to us, would have been sufficient. If this objection be a valid one, then indeed cases might arise, in which inconveniences would ensue that could not have been contemplated by the legislature when they enacted, as it is contended they did, that no inquisition should be valid which was not signed by the sheriff and so returned. Suppose that after all the jurors had signed it, and the sheriff also, that officer had refused to *return* it to the county clerk, would the court in such a case, "direct another inquisition to be taken," because that which was taken, had not been "returned to such court within a reasonable time," or would they not rather compel its return. Or suppose the sheriff, in the case now under consideration, was at this time alive, and willing, or not willing, to sign the inquisition, we think it would be in the power of the court, as they often do in cases of defective returns of property attached by the sheriff under our summary attachment laws, to take in the one case or to compel in the other his signature, *nunc pro tunc*, if that were necessary for the purpose of giving to the inquisition, the authenticity required by the statute. It is only left to state the facts, as they exist in this case, and it must we think be quite clear, that the sheriff has "signed" the inquisition, so far as the law demanded it of him. The sheriff files with the clerk of his county in due time, two papers—the first containing the warrant of the justice who directed him to summon the jury, and his own certificate under his hand and seal as sheriff of his county, that in pursuance of that warrant he had summoned certain persons whose names are set out at length, as eighteen jurors, qualified by law, &c. &c. (in the words of the statute) and that the said jury did reduce their inquisition to writing, and sign and seal the name in due form of law, as by the said inquisition thereto annexed as part of that his return will appear, and concluding with these words, "wherefore I hereby return the said inquisition to the clerk of Harford county court as directed by the act of assembly

in such case made and provided, witness my hand and seal, John Carsins, sheriff of Harford county, [Seal.]"—The other paper filed at the same time, with and constituting part of the first mentioned, purports to be " an inquisition taken, &c. before John Carsins, sheriff of Harford county, on the oaths of," &c. (as in the words of the statute) which is signed and sealed by twelve of the jurors, and under their names and immediately following them, and on the *same paper* containing them and the whole inquisition, is the following concluding sentence, viz : " I do hereby certify and return to the clerk of Harford county court, the aforesaid inquisition taken before me, on the oaths of the jurors above named, as herein set forth and reduced to writing, and signed and sealed by the said jurors in my presence, in conformity to the directions of the act of assembly in such case made and provided, John Carsins, sheriff of Harford county."    In the appropriate language of the learned judge who delivered the opinion of the court of Appeals in the case of *Higdon vs. Thomas,* 5 *Har. & Johns.* 155, it would be " a refinement upon subtilty, a total sacrifice of substance to form," were we not to say that in our judgments, " the signature is complete, the objects of the statute have been accomplished," and the inquisition " is available," so far, at least, as concerns this objection.

It is further contended that there is another fatal error in the proceedings before the sheriff, because the inquisition does not appear or purport to have been taken by said sheriff in virtue of a warrant of a justice of the peace of Harford county, to him directed ; nor does it appear in and by said inquisition, that the particular jurors, on whose oaths the same imports to have been taken, and by whom the same is signed and sealed, were, or that any one or more of them was or were, parcel of a number of eighteen jurors, inhabitants of said county, summoned by said sheriff to meet on the said land to be valued ; nor does it appear, therein or thereby, that the said sheriff summoned a jury of eighteen inhabitants of said county, not related to the parties, nor in any manner interested to meet on the said land to be valued, on the said

64        v.9

day of the taking of the said inquisition, or on any other day.

It is a sufficient answer to say, that there seems to be nothing in the statute, requiring that the inquisition should set forth, contain, or purport, any of those matters; and besides, in the view which we have taken, that all papers returned by the sheriff to the clerk, are to be regarded as one whole, each constituting a part of the other, and to be construed together, as a record of the proceedings, it does appear that all these facts are distinctly set forth upon its face.

Of a like character is the objection that " although it is set forth and stated by the said sheriff in his return of said inquisition, that he instructed the jurors in the valuation and assessment of damages, to consider in determining and fixing the amount thereof, the actual benefit which would accrue to the said owner from conducting the said canal through, or erecting any of said works upon his land, and to regulate their verdict thereby, except that no assessment should require any such owner to pay or contribute any thing to the said company, when such benefit should exceed, in the estimate of the jury, the value and damages ascertained as aforesaid, yet in truth and in fact, the said sheriff did not so instruct the said jury, nor to such or the like effect, as, by law, he was bound to do, and ought to have done.

The evidence offered at the trial, if any such was given, is not sufficient to invalidate the declaration of the sheriff, made upon his official responsibility and oath; and the assertion, in the same solemn manner, of all the jurors, contained in the body of the inquisition to which their signatures are appended, that in fixing the amount of their valuation and assessment of damages, they did consider the actual benefit which would accrue to the landholder, is greatly corroborative of the declaration of the sheriff. There is no positive injunction in the act of assembly, making it the duty of the sheriff particularly, to give this instruction to the jury, the words of the law being that " the jury shall be and *they are hereby instructed* to consider, &c." which would seem to imply that the legislature

meant that the statute itself should be before them during their deliberations, but it is, perhaps, the safer course for that officer to follow the practice which has been introduced, by giving the instruction to the jury.

Objections have also been taken to the form of the oath which was administered to the jury, and to the mode in which it was administered, because, although the inquisition purports to have been taken on the oaths of the jurors therein named, yet it does not appear, nor is it therein stated, that the sheriff administered an oath or affirmation to every juryman who appeared; of such tenor, of such import, or in such terms, as prescribed by the charter of said company; and because it appears on the face of the inquisition, that the sheriff administered to the several jurors, on whose oaths the said inquisition purports to have been taken, an oath or affirmation, in terms, and in substance and form, variant and different from the oath or affirmation prescribed and required by the charter of said company; and further, because in his return of said inquisition to the clerk of Harford county court, the said sheriff certifies and returns, that he administered to the several jurors, on whose oaths said inquisition purports to have been taken, an oath or affirmation, in terms, and in substance and form, variant and different from the oath or affirmation prescribed in the charter of said company.

In relation to the failure of the inquisition to state that the sheriff administered an oath to every juryman who appeared, it does seem to us, that the act of assembly demands it. The return of the sheriff, after setting out the names of the eighteen jurors summoned, states that "the following persons being fourteen of the jurors aforesaid appeared, to wit:" and then inserts their names. This paper, as we said before, is a part of the record of the proceedings, and the fact that he administered an oath to every juryman who appeared, is sufficiently apparent on its face. As regards the form of the oath, which was actually taken by the jury, it is admitted that although the sheriff administered it in the words of the warrant issued by the justice, and as he was thereby commanded

to do, that is to say, that each juror would "justly and impartially value the land," &c. yet as he omitted to add the word "*faithfully,*" which is contained in the section of that particular statute, it is an error fatal to the whole proceeding. It would, indeed, be a matter of regret, if even under a law, which it is conceded requires a strict construction, a court was so bound down by authority as to be allowed the exercise of no discretion, and to be obliged to sustain such an objection. But fortunately there are cases adjudicated by the highest authority in our own state, which place law and reason where they ought always to be found, side by side. We have already had occasion to quote the language of that court, in the case of *Shivers vs. Wilson,* 5 *Har. & Johns.* 132, where it was held that it was sufficient, if the course of proceeding directed by law has been *substantially* complied with. In *Thomson vs. Towson,* 1 *Har. & McH.* 507, a proceeding under the attachment laws, and in which the words "*bona fide*" were omitted, the act of assembly requiring that the oath should state that the absconding debtor was "really and *bona fide* indebted," the counsel who argued successfully the motion to quash the attachment, upon the ground of such omission, only contended (page 507) "that the *substance* of *bona fide* must be expressed,"—that "the term *bona fide,* or what is intended by the term, and what it necessarily conveys and implies, must be contained in the oath,"—but, had the oath in substance contained all that was meant by the words "*bona fide,*" it would have been sufficient, even under the strictness of construction uniformly applied to the attachment laws of this state. And in *Winingder vs. Diffenderffer,* 5 *Har. & Johns.* 189, which was a case where there was an omission of a word in an oath, the form of which was prescribed by an act of assembly, being an act for the relief of insolvent debtors, the court determined that as the omission "did not change the meaning of the oath, did not materially vary the oath," prescribed by the statute, it was sufficiently well administered. We cannot but think that the obligation of an oath taken by a juror that he will justly and impartially

value land, is as perfect as if the word "*faithfully*" were superadded to them, and inserted in its body.

The objection next to be noticed, is founded upon a supposed failure on the part of the jury to find and declare upon the face of their inquisition, that certain persons, other than the particular land proprietor in this case, were owners of said land, or of some interest or estate therein, and that consequently, they are not bound thereby. It is in proof, and indeed not controverted, that a certain Joseph C. Parker and Robert Stephenson had an outstanding interest or term for years, in a portion of the land condemned, and it is asserted that in the valuation and assessment of damages, the jury took into consideration, and allowed damages for the actual or supposed injury sustained by Messrs. Parker and Stephenson, in consequence of the cutting the canal through the land to be valued, and included the damages so allowed for the actual or supposed injury sustained by these gentlemen, in the amount of damages allowed *Mrs. Archer*, the declared and ascertained owner of the parcel of land by them valued, or intended to be valued. The term "owner" used in the 13th section of the act of 1825, ch. 180, is evidently intended to include every one having any title to, or interest in the land, because it is there provided that the valuation of the jury "shall be conclusive upon all persons, and shall be paid by the president and directors of the *Canal Company* to the owner of the land, or his legal representatives, and on payment thereof, the said company shall be seized of such land as *of an absolute estate in perpetuity* as if conveyed by the owner." In *Ellis vs. Welch*, 6 *Mass.* 251, recognized in *Parks vs. Boston*, 15 *Pick.* 203, this point was so settled. In this last case the court say, "it has been heretofore decided by this court, and apparently upon much consideration, in the case of *Ellis vs. Welch, ubi sup.*, that the term "owner," in this statute, includes every person having an interest in real estate capable of being damnified by the laying out of a street through or over it, and is equivalent to the description of "any person damaged in his property" as used in the

general act regulating the laying out of highways.   In the same case it is remarked by the court, after saying that in the valuing a piece of land there may be several entirely distinct interests therein, that " such compensation, therefore, must be apportioned among them, according to the relative magnitude, and value of their respective interest; and, of course, *there must be a separate inquiry and a separate award of damages*, upon the complaint and application of each," *id. ibid.* 203, 204.   It is true that in both these cases, the interest of the lessee was held under a deed, in one of them for three years, and in the other for a term of five years, but we cannot perceive that this would alter the principle.   In *ex parte Janings*, 6 *Cowan*, 525, in which was involved a claim for damages by persons having a right in the flow of water, it is said by the court, "*whatever interest* the claimant of damages may have, he is to be paid for."   Again, they remark, (in page 526) " that although the statute says, (as does the Maryland act also) that this acquisition obtained by the appraisal of the jury, or assessors, shall be in *fee simple,*" yet the individual claimant, though he " may have only a limited interest, a particular estate for instance, or a *right merely equitable*, the reversion or legal estate residing elsewhere," he shall be compensated.   As there are some observations made in the same case by that court, not only relating to the particular point we are now discussing, but which have a bearing also upon another question yet to be considered, we here insert them.   The court observe, (*id.* page 526,) "the question as to the extent and value of interest, is one for the appraisors (jury) and respects the amount of damages, and the persons to whom they are to be paid.   We see no more difficulty in describing and entering in a book, the *various interests which different persons may have*, in the flow of water, whether immediate, reversionary, legal or equitable, than in designating the like interests in land.   It cannot be allowed, because the estate is less than a fee, or because it is merely incidental to or issuing out of land, that therefore the owner should be divested of his right without compensation."

The Tide Water Canal Co. *vs.* Archer.—1839.

In relation to the objection now under review, we would re-
mark in conclusion of this part of the inquiry, that although
it would, in our judgment, have been the safer course to
have inserted in the proceedings the names of all the parties
claiming title to, or having any interest in, the land sought to
be condemned, and to have had an inquiry and apportionment
of damages as to each, yet it has been decided by this court in
the case of the *Philadelphia, Wilmington and Baltimore Rail
Road Company vs. Sappington*, who was in possession of the
lands condemned, and was only an owner for life, the pro-
perty being condemned as fee simple, and as belonging to
him absolutely, that this was no ground for setting aside the
inquisition, because a court of equity would, upon applica-
tion, apportion the amount allowed by the inquisition among
the parties entitled as owners; and further, in the case now
under consideration we think, that upon the evidence it was
sufficiently shewn, that the course pursued by the jury in
finding their inquisition as they did, that is to say by giving
to the fee simple owner the whole amount of the valuation of
the absolute estate in perpetuity, and accompanying it with
an endorsement thereon of their estimate of the value of the
term for years of the tenants (Parker and Stevenson) was
adopted by consent of the parties litigant, and it is clear to
our minds, that if the tenants were present at the hearing,
and acknowledged to be so, as was the effect of such con-
sent, the case of *Griffith vs. Jarrett*, 7 *Har. & Johns.* 73, is
decisive of the point that the endorsement forms part of the
award, and that the two papers taken together would make a
valid and available inquisition in favour of those gentlemen,
were it not for other considerations which will appear in the
sequel of this opinion.    In the language of the learned judge
who delivered the judgment of the court in the case last re-
ferred to, the endorsement " is signed by all the referees
(jurors) who signed the award (inquisition) and was, no
doubt, intended to be a part thereof; and no reason is per-
ceived, in point of law, why it should not have that effect.
Ascribing to it this faculty of explaining the scope and ope-

ration of the award, (inquisition,) it manifestly results, as a necessary legal consequence, that the award (inquisition) is binding upon the parties," unless it be defective, in particulars other than those set forth in this objection, of which defect we shall hereafter speak.

As to the objection that this court has no rightful jurisdiction, nor any power or authority by law, to affirm the said inquisition, because that after the same was taken and returned, the *Canal Company* prayed an appeal therefrom, which appeal was afterwards, in due course, ordered by this court to be removed and transmitted for trial to Baltimore county court, and which was, in pursuance of said order, removed and transmitted accordingly, it is not necessary to do more than to over-rule it, the counsel of the *Canal Company* having stated at the last hearing, and it being manifest, that the objection was merely filed to enable them to bring it to the consideration of this court for a decision without argument, as it had been heretofore decided by Baltimore county court, and their object being to have the benefit of a review of one or the other of those decisions, as might be by them deemed most advisable.

The next objection interposed by the *Canal Company*, which we shall consider, is in the following words, " because the circumstances and relative situation in which the said company and the said proprietor are now placed and stand, are materially varied and changed from what they were at the time the said inquisition was taken; in this, to wit: that at the time of the taking of the said inquisition, the act of assembly passed at December session, 1837, chap. 171, entitled " a supplement to the charter of the *Tide Water Canal Company*," was in full force and operation, and the then counsel of the *Canal Company* who attended on behalf of the company at the taking of the said inquisition, knowing and believing that excessive damages would be allowed by the said jury, did not deem it essential to adduce before said jury, all such facts and arguments as might, and under different circumstances would have been adduced on behalf of the

company, before the said jury; but the said counsel relied upon the right of appeal secured to the said company by said act, as an effectual and certain mode by which the said company might correct the errors, and repair the injustice, which the said jury might commit either from prejudice against the company, from partiality towards the proprietor, from the admission of improper evidence, from misrepresentations of any kind, or from misapprehension of the rules of law— whereas by reason of the repeal of said act, at the last session of the general assembly, the right of appeal so relied upon, has now been taken away from said company. By reason whereof, as the said company alleges and insists, the said inquisition was obtained by surprise, and ought not to be affirmed."

By the act of 1835, chap. 327, which was a supplement to the charter of the Baltimore and Port Deposite Rail Road Company, it was enacted by the second section, that certain commissioners therein named, should decide what damages would be sustained by persons owning lands on Gunpowder river or Bush river, by reason of the construction of any bridge erected, or which might be erected by the said company, *across either of said rivers, and should return their* proceedings to the clerk of the county, and that either party interested might file a petition to the county court, appealing from, and praying a review of, the decision and assessment of damages, made by said commissioners, and that the court should proceed thereupon itself to inquire and determine upon said claim of damages, or at the request of either party, should order and have a jury trial in the premises, and that the said claim should there be *proceeded with anew as if no decision by commissioners had been made,* and in all other respects as was lawful and usual in jury trials generally in said court, and the jury as in such jury trials being subject to the direction of the court on all points of law. And by the *third* section, it was enacted, that either party should have the same privilege of removing the case of such appeal for trial to an adjoining county, as is now allowed in civil cases in county courts, and

upon the same conditions. By the act of 1837, chap. 171, entitled a supplement to the charter of the *Tide Water Canal Company*, it was enacted that the right of appeal and removal, and course of procedure consequent thereon, secured to the Baltimore and Port Deposite Rail Road Company by the above act of 1835, chap. 327, should be extended and secured to the *Tide Water Canal Company*, upon the finding and return of any inquisition taken under its charter, or affecting the construction or reparation of said canal—in virtue of the privilege conferred by this last act, the *Tide Water Canal Company* removed the proceedings in this cause from Harford to Baltimore county court, but the proceedings themselves before the sheriff and jury who found this inquisition, were had *after* the passage of the last mentioned statute, whilst the same was in full force, but before the order for removal to Baltimore. By the act of December session, 1838, chap. 376, the law of 1837, chap. 171, was repealed, and the cause was remanded to Harford county court. This court has already decided that no such vested rights were acquired by the *Canal Company* under the act which was repealed, as would render invalid, by reason of its unconstitutionality in attempting to impair such rights, the repealing act; but we entertain no doubt that the counsel, in conducting the inquiry before the jury when the first act was in full force, had a right to look to the privileges conferred by it, and if in their judgment, and upon their professional responsibility, they deemed it proper, and as best calculated to subserve the interests of their client, mainly to rely upon their right to have a jury trial under the direction of a court as provided by that act, and to bring before that tribunal the claim for damages set up by the land-holder in this case, in order that the same might be proceeded with anew, as if no inquisition had been taken, we cannot perceive that this court is authorized to say that there was, on the part of counsel, *laches* in so doing, or in their omitting, under such circumstances, to offer testimony to the jury of inquiry. The law then in existence, gave them the right so to conduct the inquiry, and although there has since

been an alteration of the *forum*, and a modification of the remedy, it would not be, as we conceive, an exercise of sound discretion, because it might be productive of injustice to one of the parties, were we now to say, that as the *Canal Company* did not examine before the jury all the evidence which it was then in their power to procure, they shall now be debarred from offering any, and *that* in the very face of an act of the legislature, under which they had the right to submit their whole case to the court to which an appeal was allowed, and which was to proceed on the hearing of that appeal, *de novo*, and in the same manner as if no inquisition had ever been found. The familiar case of an appeal from the judgment of a justice of the peace to a county court will sufficiently illustrate this doctrine, and we here rest it by saying that there is reason, as it seems to us, in this objection of the *Canal Company*, and that even if it had not, in all cases of inquisitions, taken under these statutes, been the practice of the courts to proceed, *de novo*, the grounds upon which this objection is placed, would call for such a course, under the circumstances of this case.

The objections next in order are the following, viz: that the jury, in and by the said inquisition, have not described and ascertained the bounds of the land by them valued, and have not given any sufficient or locatable description of the same; whereas, by the express directions of law, the jury are directed to ascertain and describe the bounds of the land by them valued—also, because the warrant, returned with the said inquisition, and under the authority of which the said sheriff in returning said inquisition, professes to have acted in holding the same, does not specify or describe, with sufficient certainty, the land to be valued by the jury, which the said sheriff was thereby commanded to summon—and further, because, in his return of said inquisition, it is not stated or certified by the said sheriff, that the jury ascertained the bounds of the land by them valued, and the quantity and duration of the interest and estate in the same, required by the said company for its use.

In submitting our views upon this and upon almost all of the preceding objections, we have been induced to do so, mainly because of the multiplicity and novelty of the questions which have been brought before the court, and many of which might again arise, should this case return here from a second jury, and which probably will arise, in some of the cases now depending, and awaiting this decision. It was due also to the able and elaborate argument of the respective counsel who have expended so much labour in their endeavours to enlighten the mind of the court, that they should have something to guide them in the future progress of cases of a novel and even complex character. For the same reason, we will take occasion briefly to intimate our opinion on the point of inquiry now about to be considered. It is objected by the *Canal Company*, that the description of the lands contained in the inquisition, is not sufficiently certain, to enable the party to make a true location of them, and that if there be enough of certainty in that respect, still the jury has not complied with the mandate of the law, which requires them, *in their inquisition,* " to describe and ascertain *the bounds* of the land by them valued." It would extend too much our remarks, already occupying a space far greater than was intended, were we to review the many authorities which were cited and commented upon, by the respective counsel on both sides, with singular ability, not only in reference to the degree of certainty in the description of lands, required in deeds of conveyance, and in the returns of sheriffs as to real estate sold by them under process of law, in all which cases the law is well settled (*Blessing vs. House,* 3 *Gill & Johns.* 295 ; *Hammond vs. Norris,* 2 *Har. & Johns.* 147; *Thomas vs. Turvy,* 1 *Har. & Gill,* 438; *Clark vs. Belmaer,* 1 *Gill & Johns.* 448); but also in cases of deeds under powers—in cases of awards, where all the necessary circumstances must appear to have been performed—in the analogous cases of extent under an elegit— and of assessment of dower—and in partition. We shall, therefore, content ourselves with observing, that it is clear to us at least, that the object of the legislature being to substi-

tute for the benefit of the *Canal Company*, a title to be acquired by inquisition of a jury, instead of by a deed of conveyance, from the owner of the land who would not consent to convey, and to make the former the muniment of such title, instead of the latter, which was the usual one in case of a purchase, no greater certainty could have been intended in the one, than what was necessary in the other, and that in using the expressions " bounds of the land by them valued," nothing more was meant than that there should be a sufficient description of the property to enable the party to make a true location of it, and that it was not necessary to ascertain it by metes and " bounds," *eo nomine.* We think it also equally clear, that either in the case of a deed of conveyance, or of an inquisition in the nature of an *ad quad damnum*, matters *in pais* may be resorted to, in order to get at the true location. It is said in *Jackson vs. Ambler*, 14 *Johns.* 109, by Mr. Justice *Spencer*, in delivering the opinion of the supreme court of New York, that " no lands can be conveyed by any possible mode of expression, dispensing with the necessity of parol proof to locate it." All that is required in any such case, is, " certainty to a common intent," and that is accomplished where there are objects called for, which can be certainly ascertained, and when so ascertained, will enable us to fulfil the intent, and get at the real thing conveyed. *Id certum est, quod certum reddi potest.* But the more serious part of this inquiry is this, are these lands, as described by the jury in their inquisition, " locatable," to adopt an appropriate word which is used by the court of Appeals in *Blessing vs. House, ubi sup?* In other words, are there "any metes or bounds, or other description, by which its location could be established," or which "would enable him (the sheriff) to make a location of them ?" (*Fenwick vs. Floyd*, 1 *Har. & Gill*, 174.) Is there, in the language of another adjudication " sufficient certainty to enable the party to make a true location of them?" (*Clark vs. Belmaer*, 1 *Gill & Johns.* 449, *ub. sup.*) Feeling the full force of the remark of the learned judge who delivered the opinion of the court in the case referred to, at

the argument (8 *Gill & Johns.* 359, *Marshall vs. Greenfield*) and disposed as well as bound to bow to its authority, and making "every reasonable intendment to effectuate the object" which the jury had in view, and regarding the case before us as if it were a judicial sale, and thus within the scope of that decision, we incline to the opinion that the description of the land as set forth in the inquisition is "so entirely vague as to make it uncertain what was intended," and that if this were the case of "grantee against grantor," the property would not pass. In almost all the cases which have been referred to, as supporting the sufficiency of the description as given by the inquisition in the case now before us, either the commencement and termination, and the courses and distances were given, or a plat or diagram accompanied the description and made part of, or was referred to by it, so that the actual location could, at any time, be readily ascertained, (11 *Pick.* 274, *Merrill vs. Inhabs. Berkshire.* 14 *Johns.* 96, 107, *Jackson vs. Ambler.* 27 *Mass.* 211, *Davis vs. Rainsford.*) In the description of the lands which are the subject of the present controversy, there are, as it seems to us, several points of ambiguity, not susceptible of explanation by any parol proof which could be legally received; but that which is, in our judgment, fatal, relates to the places of commencement of the first line of each parcel. The description is, for one parcel, "beginning *at the lands* of Herman Stump, and running thence down the canal and parallel thereto," &c.; and for the second parcel, "beginning *at the lands* of the heirs and devisees of James Stephenson, and running," &c. There is no stake, stone, or other natural boundary or monument referred to as designating the spot at which the starting point on Mr. Stump's land is situate, nor any plan, plat or diagram referred to in the description, which might explain the actual place of beginning. The same remark may be made in relation to the commencement of the first line of the second parcel of land, beginning at the lands of the heirs and devisees of Mr. Stephenson. It was contended that this ambiguity as to the place of beginning, might

be explained, by oral proof, to the officer who might be called to lay off the land, that it was at that point of Stump's lands where the canal first touched. In the language of the learned judge who delivered the opinion of the court in *Thomas vs. Turvy*, 1 *Har. & Gill*, 438, 9, *ub. sup.* we think "the ambiguity on the face of the conveyance (inquisition) could not be explained by extrinsic circumstances," there being no point of beginning mentioned in the description, and no diagram to shew it; so that the place of commencement being uncertain, we could not surmount the difficulty on that score, even by giving to the case of *Makepeace vs. Bancroft*, 12 *Mass.* 469, all the authority which is claimed for it, and allowing as valid in a description of land a reference for its boundary to a monument not actually at the time existing, and not even stated to be staked out, (the then intended canal,) but afterwards made and completed, the parties always meaning to conform, and actually conforming to the description. No such difficulty could now arise, as it is understood that the whole canal is completed along this land, and that the company is in possession of all that they require under the act of assembly. The description which is at least somewhat doubtful as to its certainty could, therefore, now be made, in any future proceeding, with sufficient accuracy, and indeed with perfect certainty.

We do not think, that in a case of a proceeding of this kind, this court has jurisdiction to correct the description in the inquisition, except by consent of parties. It is not like the case of a special verdict, which being returned by a common law jury attending at court, may, in some cases, be corrected. The jury is, in this case, *functus officio*, and the members composing it not having been our officers, or under our control, we cannot correct their act. Nor is it like a sheriff's return of property seized under the attachment laws, where we can, once having obtained jurisdiction, require him as our officer, to correct his return, if defective, according to the facts as they exist. Nor do we think that the tender of a deed which has been made by the proprietor, correcting the

error in the description, and offered to be delivered condition-
ally, but refused to be accepted by the other party, can alter
the case, (*Rail Road Company vs. Bucher,* 7 *Watts,* 33, 35.)
And we are not prepared to say, looking at the peculiar
nature of this proceeding, and the limited power and control
of this court over it, that it does not lie in the mouth of either
of the parties, even of the *Canal Company* itself, whose agent
furnished to the jury, as it is alleged, the defective descrip-
tion, to take advantage of such defect. If a plaintiff in a
case under our attachment laws were to obtain a condemna-
tion, and had levied upon the lands seized by his order under
a defective proceeding liable to be quashed, on that ground,
on motion by subsequent creditors who had attached regu-
larly, we are not prepared to say, in the absence of all autho-
rity upon the point, that his own irregular proceeding might
not, on his own motion, be set aside by order of court, in
order to enable him to issue a new writ, whereby he might
obtain satisfaction of his debt, which would, on his first action
or process, be certainly lost.    To deny him such a privilege,
at least in a case where there was no fraud in his previous
proceeding, might operate great injury to him.    And we can
see no reason why the *Canal Company* itself, may not, in a
case in which the description it has inadvertently furnished
to the jury, is found upon more mature consideration, to be
defective, object to the affirmance of the inquisition.    It is at
least a case of doubt, and we are not satisfied with the de-
scription of the lands taken, as set forth in the inquisition,
and think there is ground for the objection in this behalf
interposed by the *Canal Company,* (*Commonwealth vs. Fisher,
et al,* 1 *Penna. Rep.* 466.)    It would be advisable, and cer-
tainly more safe, that the objections, as well to the inquisition
itself, as to the return and warrant, should be obviated, as far
as may be practicable, in any future proceeding.

It is further asserted and urged, by way of objection, on
the part of the *Canal Company,* to the affirmance of this
inquisition, that the jury or some of the jurors, in their valua-
tion and assessment of damages in this case, from misappre-

hension of their duty in the premises, did not act upon their own conclusions, according to the best of their skill and judgment, of and upon matters submitted to them; but adopted and acted upon the opinions of the witnesses, or of some one or more of the witnesses, who were adduced and testified before them on the part and behalf of the proprietor in this case; and regulated their estimate and assessment of damages in this case, in accordance with the opinions so adopted and acted upon, in disregard of, and contrary to their own conclusions, according to the best of their skill and judgment of, and upon the matters submitted to them; and contrary to what they deemed to be right and just.

According to our present recollection of the testimony on this point, given by the jurors themselves, and recalling to ourselves the inference we drew therefrom at the trial, we think it is not entirely clear whether some of the jury were not open to this objection, by reason of their having regarded it as a matter of imperative duty on their part, to regulate their opinions, at least on a portion of the subject matter of the controversy, by that of some of the witnesses. The deduction we drew from their evidence was, that on the subject of the value of the water power, and perhaps of the quarries, they had very little knowledge themselves, and therefore depended greatly, if not entirely, upon that of others who had better information, and were more competent to judge, than they were as they supposed, on those matters, and whom they examined as witnesses. That, in order to decide upon these matters submitted to them, of which they had no particular knowledge, especially as to the water power, they felt themselves at liberty to enlighten their own judgments, by receiving the opinions under oath, of men conversant with such subjects. It has been the practice, heretofore, in cases of this nature, to allow a jury to have evidence adduced on either side, and although there has been, in this state, no decision upon this point, so far as we are informed, we think the practice founded upon reason. In the case of *Parks vs. Boston,* 15 *Pick.* 210, although the

chief justice in delivering the opinion of the court, does say, when speaking of the estimate of damages by a jury " upon view, " that " the jury must exercise their own knowledge and experience fully; and perhaps, in most instances, with a competent and intelligent jury, such judgment could not be much aided by the estimates of others, though under oath, in the form of testimony, " yet he also remarks, that although he could not perceive why they might not have estimated the damages upon their own experience and judgment, without any evidence *aliundo*, still " they might be at liberty to enlighten their own judgments by the aid of testimony." Surely it would seem to be reasonable to permit them to do so, upon those subjects, at least of which they might not have any very accurate knowledge, or upon which they could not, without information derived from some source, exercise to the best advantage, their own judgment or skill. Whether after hearing the evidence in this case, the jury were governed by the conjectural opinions or hypotheses of the witnesses founded upon arithmetical or other calculations, instead of looking to facts detailed by those witnesses and properly in evidence before them, and whether from these facts the jury drew such inferences as would justify the amount of their assessment, and if they did, whether the conclusions to which they came were such as ought now to be sanctioned upon a full consideration of all the additional testimony which has been taken before the reviewing tribunal, are entirely different questions from that we are now considering. Least it should be supposed, however, that because the oath taken by the jurors, requires them to decide " according to the best of their skill and judgment," they have no right, or ought not to hear any evidence, we will take occasion to remark, for the information of parties in future cases, that we think the jury ought, in addition to the privilege of the view of the lands sought to be condemned, which is accorded to them by the statute, to have if they desire it, or if either party interested offer it, any testimony calculated to enlighten their judgments, or to increase their skill, which

would in ordinary jury trials, be legally admissable before them. We do not say, that they are imperatively bound to decide according to that evidence, without regard to their own opinions formed upon the view of the lands, upon their knowledge of the value of real property in the neighbour-hood, and upon their own skill and judgment, which the statute supposes them to possess; but they are to balance the evidence as one of the circumstances and part of the foundation upon which their judgment is to be based, and to give to it due weight. It certainly would not be a proper execution of the duty imposed on them by the act of assem-bly, were they to regulate their estimate of damages in accordance with the opinions of witnesses, however skilled or scientific, in disregard of, and contrary to their own con-clusions, formed according to the best of their skill and judg-ment, but waived and abandoned because of their conflict with those opinions.

Another objection set up by the *Canal Company*, to the confirmation of the inquisition, is that the right to a portion of the water power claimed by *Mrs. Archer*, and for which she has been allowed damages, by the award of the jury, does not in fact reside in her, but in other persons. It is in evidence before us, that the late Mr. John Stump, of Stafford, the original proprietor of the entire combined water power, tranferred by deed of the tenth day of December, 1798, to the Messrs. Wilsons, a portion of the land to which this water power was attached, say about 33 acres, reserving to himself and his heirs or assigns, the privilege of digging or making a canal through the said land sufficient to convey the water of Deer creek across Rock run for water works or boat navigation, and to enjoy the same for ever, to his and their own proper use and behoof, on their paying to the Wilsons, or their heirs or assigns, any damages they might sustain by said canal, which damages should be left to be settled by persons mutually to be chosen by the parties, if they could not agree among themselves.—That subsequently the Wilsons conveyed a small portion of the land sold to them by Stump,

say about 2 acres, to the late James Stephenson, whose heirs now own it, and that the residue was reconveyed to Stump by the Wilsons. Upon this state of facts, it was contended that the right to *the soil* passed absolutely from Stump by his deed, to the Wilsons, notwithstanding the reservation therein, of the privilege of digging a canal, and that this reservation was only a covenant personal to the parties, not running with the land, but that the right or privilege reserved was to be exercised in the life-time, of the grantor, Stump, and not afterwards. In support of this position, and *e contra* by the opposing counsel, several authorities were referred to, (*Thompson vs. Gregory*, 4 *Johns.* 83; *Vanderburg vs. Van Burgen*, 13 *Johns.* 217; *Russell vs. Scott*, 9 *Cowen*, 280, 1. *Jackson vs. Vermilyea*, 6 *Cowen*, 681; *Pettee vs. Hawes*, 13 *Pick.* 327; *Hills vs. Miller*, 3 *Paige*, 257, 8; *Astor vs. Miller*, 2 *Paige*, 78; 1 *Serg. & Rawl.* 229, *et seq*; *Ex parte Jennings*, 6 *Cowen*, 526; 9 *Wend.* 247;) various other questions were argued, displaying much research and learning on the part of the respective counsel, and growing out of the deeds just mentioned, and other deeds and papers and matters *in pais* given in evidence, which points we do not think ourselves called upon to decide. It would consume too much time, and unnecessarily, and would occupy too large a space, were we to review these cases, and comment upon them and upon the argument of the counsel, in the extended manner we should be obliged to do, were we to enter fully upon the subject. We incline strongly to the opinion that the right to the soil never did pass from Stump, but that even if it did, we are clear that the title to that portion of the water right which is attached to the slip, or small piece of land conveyed by Wilsons to James Stephenson, is vested in *Mrs. Archer*. We think so upon several grounds, which, with a single exception, it will be unnecessary particularly to specify, as well because in doing so we should swell our remarks beyond reasonable bounds, as that they will very naturally suggest themselves to the counsel who spread them out before us, in the argument. It is sufficient to say, that if there were

nothing in this part of the inquiry, except the will of the late James Stephenson, coupled with the facts in evidence before us that his executor, who by the will had the power to sell or dispose of any interest which his testator had in the premises, was present at the taking of this inquisition, and assented to *Mrs. Archer's* being regarded by the jury as the owner of that portion of the water right, leaving the heirs of Stephenson to claim, through the intervention of a court of equity, or other proper tribunal, their distributive share of the amount awarded as damages, should they find that they had any interest or title—and with the further fact that the absolute estate of the same in perpetuity was estimated by the jury and found by their verdict, these facts of themselves would be sufficient to sustain the inquisition, in this branch of the case. We do not feel ourselves at liberty to question the authority of the adjudication in this court, to which we have heretofore referred, (*Sappington's case vs. The Rail Road Company,*) but were we now disposed to re-examine it, we should re-affirm it, having had occasion not long since to consider the question presented by that case, and we approve the principle which was there established. Doctor Sappington was the owner for life only, of the land which was taken for public use, but it was condemned in perpetuity, and was so returned by the jury empannelled, who allowed damages for it as a fee simple estate. The court held that the owner of the remainder of the estate, was bound by the inquisition, although notice was actually given only to the party in possession, the owner for life, and that the former might avail himself of all benefit of the damages awarded, to the extent of his interest, by application to a court of equity for a proper distribution of that fund. We came to the same conclusion, upon considering this question, which although not presented at the trial, was afterwards suggested to us as worthy of inquiry, and received our deliberations in the case of the *Messrs. Whites vs. the Mayor and City Council of Baltimore*, but there was no decision upon this particular point made by us in that case, nor was there any such by the

court of Appeals, so far as we have been able to learn, when our judgment came under review of that tribunal—we do not understand that this particular point has passed under its judgment, and until the principle established by the case of Sappington, shall be deemed erroneous by the court of last resort, we feel disposed to adhere to it, especially as we find that the same doctrine which seemed to us to be the correct one, has since been maintained and enforced in a very elaborate opinion which has been submitted to our inspection, pronounced by that learned and profound jurist Kent, the late chancellor of New York. There is, as we think, for the reasons we have assigned, no cause, so far at least as concerns this particular objection, to quash the inquisition.

The last objection we have to consider, is, that " the damages allowed in this case, are excessive." This objection embraces, among several others, the four specifications contained in the paper, which was first filed as shewing cause why the inquisition should not be confirmed, and they are designated by the numbers, 20, 21, 22, 23.

The jury are instructed by the statute, to " value the land, and all damages the owner thereof shall sustain by cutting the canal through such land, &c."

It must be conceded, that the rule by which damages are to be estimated, is, in all cases, a question of law. The jury are to apply the rule, but the rule itself is to be established by the courts. It is held in Massachusetts, that in trials before a jury of this kind, it is the duty of the sheriff to determine questions of law, (*Merrill vs. Inhabs. of Berkshire*, 11 *Pick.* 274,) and such would seem to be the law in England, (*Leigh vs. Paterson*, 8 *Taunton*, 540. *S. C. 4 Serg. & Lowb.* 204. *Gainsforth vs. Carroll*, 9 *Serg. & Lowb.* 204. *S. C. 2 Barnw. & Cressw.* 624.) Certain it is, that at the trial, it is necessary for the progress of it, and for the purposes of justice, that the power of determining upon the competency of witnesses, the admissibility of evidence, and other incidental questions arising in the course of the trial, should reside somewhere, and whether it be exercised by the sheriff,

or by the jury, or by both conjointly; it would seem proper that a right of review should be vested in some tribunal of law competent to settle such matters definitively. If, then, the jury have mistaken the rule, and in assessing damages have adopted one which is erroneous in principle, it will not be contended that this inquisition ought to be confirmed, however justly, faithfully and impartially they may have desired, and without doubt did intend, to act, in applying that rule. To confirm the inquisition, under such circumstances, would work injustice as effectually, as if, in applying a true and correct rule of damages, they had assessed an amount far exceeding what the facts of the case would have justified. Analogies, as to a proper rule for the finding of damages, may be drawn from decisions in actions for breach of covenants of seizin and quiet enjoyment, but none can be found in actions of *tort* for unlawfully taking and detaining property belonging to another, because in the latter class of cases one party is a wrong-doer, and we have already said, that the *Canal Company* is, in this proceeding, not to be regarded in that light, but rather as a purchaser of land for a public improvement, the consideration for which is settled by the appraisement of a jury, only because the parties are unable to agree upon that. It is settled that in actions of seizin and quiet enjoyment, after eviction of the purchaser, he cannot recover for the increased value of the land, because the covenant cannot be construed to extend to any thing beyond the subject matter of it, that is, the land as it existed and was worth, when the covenant was made, and not the increased value of it, subsequently arising from causes not existing when the covenant was entered into, (*Cannell vs. McLean*, 6 *Har. & Johns*. 300. *Pitcher vs. Livingston*, 4 *Johns*. 1 *et sequent, to* 23. It is the land, and its price or value at the time of the sale, which was the subject matter of the contract, and which the parties had in view. And we apprehend there would be danger of injustice in adopting any other rule in cases of the nature of that we are now considering. To use the language of Mr. Justice Spencer, in the case just

cited, (4 *Johns.* 13,) such a rule ought to be fixed, as "shall bear analogy to other cases, and attain complete justice between the parties. I am not sensible that any general rule, in almost any given case, will invariably be free from exception. It is the very nature of general rules, sometimes to operate harshly, but the necessity of a fixed standard of justice, is of more importance to the interests of men, than one that is capricious and fluctuating." The only safe rule, as it seems to us, is to look upon this estimate of a jury, just as if it were a case of an intended purchase of the land and of the water rights, quarries and other appurtenances thereto, (supposing the hypothesis to be correct that they were all destroyed, or rendered wholly useless to the proprietor,) and that the jury were called upon as a tribunal, to fix the real fair value of them, as they then existed at the time they were taken by the *Canal Company*, and not as it might be at some future period, arising from causes not existing at that moment. In the language of Mr. Justice Gibson, in delivering the opinion of the supreme court of Pennsylvania, in the case of *The Schuylkill Navigation Company vs. Thobarn,* 7 *Sergt. & Rawl.* 422, recognized as authority by Mr. Justice Baldwin, in delivering the judgment of the circuit Court of the U. S. for the eastern district of Penna. in the case of *Chalkley Atkins vs. Phila. and Trenton Rail Road Company,* (pamphlet cited at the argument,) " the only safe rule is, to inquire what would the property unaffected by the obstruction (canal) have sold for, at the time the injury was committed? What would it have sold for as affected by the injury? The difference is the true measure of compensation." Or, as Mr. Chief Justice Savage says, for the supreme Court of New York, when delivering its decision *in the matter of Albany street,* 11 *Wend.* 153, " it seems to me that the true rule of estimating the damage is, to appraise the property at its present value to the owner, considering the extent of the interest which the owner has, and the qualified rights which may be exercised over it." And Mr. Chief Justice Shaw adopts the same rule in *Parks vs. Boston, ub. sup.* 15 *Pick.*

209, where after stating that the taking of private property for public use, is substantially a purchase for its price or actual value on the day of such taking, he remarks, "and what difference can it make to the plaintiff (owner) that his particular estate would have been worth more or less, if he could have kept it to an after period." We think too that the same rule would seem to have been adopted by the supreme court of New York, in 17 *Wendell,* 670, *in the matter of Furman street.* That was a case in which a rule of damages was established as to a person supposed to be greatly benefitted by the extension of a street which passed along the line of his property, and left it, by reason of a deep cutting along that line, exposed to fall down, unless a wall should be erected at considerable expense, to keep it up, and yet no allowance was made to him. The same court had previously, (11 *Wend.* 153 *in the matter of Albany street,*) said, that "clearly the same rule should be adapted for the assessment whether for damage or for benefit." That is to say, there should not be a different rule as to the valuation of property taken for public use, charging persons benefitted by one rule, and allowing to those injured a rate of damages by another and a different rule.—Afterwards, in the case of *Furman street,* 17 *Wend.* 669, Mr. Justice Bronson, in pronouncing the opinion of that court, says, "all classes and conditions of men hold their property subject to the paramount claims of the state; and when it is taken for public purposes, and the question of compensation is presented, the only proper inquiry is, what is its value? The question is not, what estimate does the owner place upon it, but what is its real worth, in the judgment of honest, competent and disinterested men?" And in page 670, he remarks, that "the proper mode of adjusting the question of damages is to inquire, what is the *present value* of the land, and what will it be worth when the contemplated work is completed?" And again, *id. ibid,* "what price will it bring in the market? That is the proper inquiry in a proceeding of this kind. As between individuals, the owner may demand any price,

however exorbitant, for his property; but when it is taken for public purposes, he can only demand its real value. That value cannot depend in any degree on his own will." And in *Fairman vs. Fluck*, 5 *Watts*, 517, in a case somewhat analogous in principle to those already cited, in relation to the measure or standard of damages, the rule adopted in 7 *Serg. & Rawle*, 411, again received the sanction of the court.—See also the decision in 14 *Serg. & Rawle*, 82, 83; and the powerful reasoning of Ch. J. Tilghman, who delivered the opinion of the court.

It was shewn most clearly to our minds, by the evidence at the trial in court, that the jury in estimating the value of the water power on the lands taken from the proprietor in this case, were not governed by any such rule as that which has received the sanction of the courts of Pennsylvania, New York and Massachusetts, (7 *Sergt. & Lowb.* 422, *and case in Circt. Cot. U. S. per Baldwin, Judge, ub. sup.;* 11 *Wend.* 153. 17 *Wend.* 670.; 15 *Pick.* 209,) and which upon principle, independent of all authority, we are satisfied ought to be the rule. Almost any other would involve the subject in utter uncertainty, and render the valuation of property taken in cases of this kind liable to speculative damages and dependent upon possible schemes and contingencies. The jury did not value the water-right of the proprietor in this case, as an *unimproved* power, just as it existed at the time, and assess it at such a price as it would then bring in the market, but having assumed that it would be combined with other water-rights belonging to different persons, they made their valuation upon the basis of speculative profits which in the opinions of various witnesses who were examined before them, would arise in the event of future large investments and expenditures by persons to be interested in an extensive enterprise requiring a large capital. Having heard evidence from several witnesses of the quantity of fall which the combined water power of one or more persons together with that of the land proprietor in this case would give, and as to what the whole would be worth at tide, (the witnesses themselves testing that

valuation by a supposed investment of a large capital to carry on a most extensive business in the sawing of lumber by as many as thirty saw mills, and founding their opinions as well upon that circumstance as upon a hypothetical expenditure, besides of a considerable sum of money for the cutting of a suitable race, the erection of a dam, and the construction and machinery of those mills) the jury likewise acted upon the same test or hypothesis, and based their assessment upon testimony of that character, and instead of awarding what, in their judgment the property would actually at the time sell for, they abandoned their own judgment of the value of the property and gave a sum, such as, in the opinion of the witnesses it might bring, or perhaps ought to produce at some future period, if in the hands of great capitalists embarked in such an extensive enterprise. To show how unjustly such a rule would operate, it would not be difficult to put cases by way of illustration, in reference to the prospective value of property situated in the vicinity of a spot upon which public opinion had universally fixed as the probable site, at no very distant period, of a flourishing city—or we might put the case of lots of ground situated in the neighbourhood of the lands the subject of this controversy, say, for instance, in the town of Havre-de-Grace, and looking forward through the vista of time to the effect of the great improvements now in progress, and the large business which will hereafter be transacted there, when capitalists shall make investments—or even to real estate situated in, or near to the city of Baltimore, when all her hopes and those of the state shall have been realized by the successful termination of those great public works in which both are so zealously engaged. Surely in such cases, it could not, with justice be asserted, that property at either of those sites, should it be wanted immediately for the public use, should be assessed and valued, and paid for, by those who take it for that public purpose, at those prospective prices which are dependent upon contingency and conjectural calculation, no matter how reasonable and even well founded they may appear. We do not mean

to say that a jury would be prohibited, even in these cases put by way of illustration, from taking into consideration the most advantageous use to which property might be applied in the hands of one who is disposed to make it yield the greatest income; on the contrary we admit that such a circumstance would properly form a *datum* or ingredient of the assessment or valuation which they are called upon to make, but still the inquiry would at last be, what price will the property bring at this time, in the market? What will it, under all circumstances, sell for *now*? That price is its intrinsic value. We repeat that it appears to us, that the true value is in reason what it has been shown to be by authority, as well in adjudications, upon lands taken for public use under statutes in the nature of an *ad quod damnum*, as in other analogous cases.

We are further of opinion, from a careful and deliberate consideration of the testimony taken before the court, that however correct the conclusions of the jury may have been from the evidence adduced before them, there is, since the examination before us, at which much additional testimony was given, great reason to think, that they have been mistaken as to facts, and that another examination before a new jury is necessary for the purpose of doing complete justice. We are not satisfied that there was not some error in the calculations of the height of the water-fall on *Mrs. Archer's* land—if they allowed her any thing except for her own water-rights, independent of, and not combined with that of other persons, as some of the jurors certainly did, we think upon the authority of some of the cases herein before referred to, that such an allowance was made on an erroneous principle. And as relates to the fall of the *combined* water power, there was evidence before the court, to show that even if they proceeded upon a correct principle, they may have greatly over-estimated that combined water-power. There is evidence from which an inference might be drawn that they erred in their conclusion and correspondent valuation, when they proceeded upon the basis that the quarries were totally de-

stroyed—and there is also evidence worthy of being sent and submitted to a second jury, as it was not before the former one, that the quarries are even more valuable now, than when the canal was not contemplated. The same remark may be made in relation to the conclusions to which the jury came as to the injury done by the cutting of the canal, to the mill, to the landing place, to the Rock Run establishment as a place of business, and to the land taken as part of the island, upon all which subjects we are satisfied from the evidence, that there is at least a reasonable doubt whether justice has been done; and that this inquisition can only be set right by a new trial, which in the words of Lord *Mansfield*, (1 *Burrow*, 393,) "is no more than having the cause more deliberately considered by another jury." In the case of *Abbot vs. Sebor*, 3 *Johns. Cas.* 46, Mr. Justice Kent said that he was of opinion that owing to the "extent of the demand in that case, its complex nature, its importance, its novelty and the uncertainty whether justice has or has not really been done, there are sufficient reasons why it should be re-examined by a jury,"—and in *Pemberton vs. Pemberton*, 13 *Vos.* 299, Lord Chancellor Eldon said, "the ground upon which a new trial ought to be granted, is this: I do not think this question has been sufficiently tried. This court, though it cannot control the conclusion of a jury upon a will, must take care that the cause shall be fully and satisfactorily tried, especially where the question is of great value," &c.

Upon the subject of the award in favour of Messrs. Parker and Stephenson, for the interest or term of years which they had in a portion of the land condemned as belonging to *Mrs. Archer*, and for which they received an allowance of $2,000, endorsed upon the inquisition returned in her case, and to be deducted from the whole amount which was awarded to her, it follows from what has been said upon the subject of the rule as to damages adopted by the jury, that although the award to these gentlemen was not defective by reason of its having been found by way of endorsement on the back of the inquisition returned in the case of *Mrs. Archer*, yet it is

obnoxious to the same erroneous rule of damages which governed the jury in making their estimate. It was in evidence that they were tenants at a certain annual rent, for a term which would expire in the round of a little more than a year, and there being some testimony to show what profits they might possibly, or perhaps probably have made upon their business during that period, had they been left unmolested in the enjoyment of the premises, and as to the loss of custom by their being obliged to relinquish their place of business, the jury were influenced by those considerations and others of a kindred character, and rendered a larger verdict than they would otherwise have found. Such a standard of damages is too uncertain and variable, and falls within the principle of the authorities which have been referred to in a preceding part of this opinion. In *Fairman vs. Fluck*, 5 *Watts*, 516, 518, which was a case of *replevin* for goods taken as a distress for rent, the defence of the tenant was, that the landlord, by the lease covenanted to make certain improvements in the yard attached to the rented premises, which was a wagon-yard tavern house, but did not perform his covenant, by reason whereof the tenant lost his custom as a tavern keeper, and therefore sustained damage to the whole amount of the quarter's rent claimed in that suit. The tenant was allowed to set up as a defence, this breach of covenant on the part of his landlord, but the question was what was the proper measure of damages on such breach. The supreme court of Pennsylvania, after again recognizing the rule established in 7 *Sergt. & Rowle*, 411, *ubi sup.* say, "and in estimating the value of the item, in the present instance, not only are speculative and remote damages to be rejected, but even the proof of a direct loss of business, by showing that a customer went away in consequence of the situation of the yard. Such standards are uncertain and variable, depending on the amount and value of custom, and different with different tenants; whereas the rule ought to be certain and uniform."

If, in addition to the mass of authority we have adduced

in support of the fixed, uniform and certain rule as to damages which we have adopted, it were necessary to call in aid the opinions of learned elementary writers and distinguished jurists, it would not be difficult to do so.   We shall content ourselves with one or two extracts.   The first is from *Story on Agency*, 216, the work of one eminent for his sound legal knowledge and extensive attainments, and whose opinions among the members of that profession which he adorns, are deservedly held in high estimation.   Speaking of a proper standard of damages in cases bearing some analogy to that under our consideration, he says, "but possible or probable future profits or contingent and speculative gains, would constitute no just ingredients in the estimate of such loss or damage, from the uncertainty of their nature, the fluctuating and changeable elements on which they depend, and their inadequacy and unfitness *as a rule* in a great variety of cases, where a wrong has been done, &c." And in the case of *Short vs. Skipwith*, 1 *Brockenbrough's Reports*, 108, containing Chief Justice *Marshall's* decisions, that eminent judge and profound jurist remarks, in an analogous case, "it is said and truly said, that extravagant calculations of conjectural profits are not to be indulged, and will never be regarded in courts of justice as the standards by which damages are to be ascertained." The last extract we shall quote, is from the opinion of the same judge, in delivering the judgment of the supreme court of the United States in *Bell, et al, vs. Cunningham*, 3 *Peter's Sup. Cot. cas.* 86, wherein he says, (it being the case of a breach of the orders of a principal by his agent,) "we do not mean that speculative damages, dependent on possible successive schemes ought ever to be given; but positive and direct loss, resulting plainly and immediately from the breach of orders, may be taken into the estimate." So in the case before us, the jury ought to have allowed damages to the land proprietor, or to any person having an interest in the property, sought to be condemned, for any direct loss, resulting plainly and immediately from the making of the canal thereon.   In awarding an amount beyond this

rule, as we think they did, to Messieurs Parker and Stephenson, they erred, and their inquisition must be set aside.

It is therefore this second day of October, in the year 1839, ordered and adjudged by Harford county court, that the inquisition heretofore taken in the case of *Mrs. Ann Archer vs. The Tide Water Canal Company*, and returned to this court, together with the award endorsed thereon in favour of Parker and Stephenson, be, and the same is hereby set aside, and the sheriff of Harford county is hereby required and directed, to cause to be taken with all convenient speed, and in the mode prescribed by the acts of assembly in such case made and provided, another inquisition, and to return the same to this court pursuant to law.

R. B. MAGRUDER,<br>JOHN PURVIANCE.