Todd v. Austin.

— ◦ ◦ ◦ —

THELUS TODD AND OTHERS *vs.* WILLIAM P. AUSTIN AND OTHERS.

The act of 1864, known as the flowage act, (Rev. of 1866, p. 89,) is not unconstitutional. The decision to this effect in *Olmstead* v. *Camp*, 33 Conn. R., 532, confirmed upon full argument.

It is no objection to proceedings under the flowage act, that the mill is not on the same tract of land upon which the dam is sought to be erected, and that land belonging wholly to other parties lies between.

Where the petitioners had called on two land owners to state on what terms each would allow his land to be flowed, and one had declined to give any answer, and the other had demanded more than the petitioners were willing to give, it was held to be a case where the parties were " unable to agree as to the damages to be paid " within the meaning of the statute.

Todd v. Austin.

Where the committee, upon a petition for authority to raise an existing dam to a greater height, in their report stated the authorized height merely as so much additional height to the existing dam, it was held that they had fixed the height with sufficient certainty.

The provision of the state constitution (Art. 1, § 11,) that private property shall not be taken for public use without just compensation, is not to be regarded as a grant of power to the legislature, but as a restriction upon the exercise of the right of eminent domain already existing. [Butler and Carpenter, Js.]

The legislature may lawfully grant rights of easement to individuals or corporations to enable them to erect and operate structures, if the result of their operation is the production of an article or thing intended to be furnished or sold to the public for a beneficial use, and to supply their reasonable wants. [Butler and Carpenter, Js.]

PETITION under the flowage act, praying for authority to raise a mill dam above its existing height, and for the assessment of damages to the several respondents, whose lands would be overflowed thereby. There were three petitioners and the petition alleged that they were severally the owners of mills on a certain brook known as Stony Brook, running out from Paug Pond, and that all their mills were supplied with water from the pond, the dam being situated at the outlet of the pond, one of the petitioners owning and operating a grist mill, another a mill for the manufacture of axe handles, and the third a mill for the manufacture of tin ware. The petition was brought to the superior court in New Haven county, and was referred to a committee, under the statute, who made the following report.

" We find that the flowing of the land described in the petition, in the manner proposed in the petition, will be of public use; and we establish the height to which the dam may be built by the petitioners, to be such a height as will raise the water of Paug Pond three feet above the height to which the waters of the pond would be raised by the dam as it stood at the date of the petition, namely, on the 23d day of February, 1865; and we do further establish that said increased height of the dam shall be kept up, and the gate thereof kept shut, for the period of four months in each year, namely, from the first day of December in each year until the first day of the following April, and may be kept up during the remain-

ing months of each year at the pleasure of the petitioners. And we do further assess to the several respondents the following sums, to be paid to them respectively by the petitioners, for the right to flow their lands in the manner hereinbefore established, and as the damage occasioned to them thereby, as well to the lands of the respondents which will be overflowed by the raising of said dam as to all other lands of the respondents, namely: to William P. Austin, $30; to Joel Austin, $30; to Horace Austin, $90; to Gustavus R. Elliot, $200. And we do further find and report that the dam described in the petition and referred to in this report, is situated on a piece of land belonging to the petitioners, separated from each of the pieces of land on which the water mills and manufacturing establishments of the petitioners are situated, by several intervening pieces of land belonging to several and different owners, and not belonging to the petitioners or any of them."

The respondents filed the following remonstrance against the acceptance of the report:—

" The report of the committee in said cause having been returned to the present term of this court, as on file, now the respondents here in court object to the acceptance of the same, because it was proved before the committee, and not denied, that the dam mentioned in the petition and sought to be raised is not situated on the same land upon which any of the water mills mentioned in the petition are located, and because also the respondents objected before the committee, for the reason aforesaid, to the introduction of any testimony for the purpose of showing that the flowing of the lands mentioned in the petition, in the manner proposed, would be of public use, or for any purpose whatever, claiming that all such testimony was inadmissible, and that the committee, were not authorized to inquire whether or not it would be of public use to flow said lands by means of a dam erected upon land no part of which was connected with or attached to the land upon which any one of the water mills mentioned in the petition was located, but the committee, notwithstanding said

objection, received and heard said evidence and assessed damages for the flowage of said lands.

" And the respondents further allege that the statute upon which the petition is instituted, and all proceedings under it, are nugatory and void, and that the statute is in violation of the rights of property vested in the respondents respectively, and contrary to the constitution of this state, because they say that the acts complained of by them are not the taking of their property for public use, but only for private use."

" And they further allege that said finding and report of the committee are indefinite, vague and uncertain, and not in conformity with the requirements of the statute, and that they do not show with certainty the height to which said proposed dam may be raised, nor will the record show with certainty the matter attempted to be determined."

The respondents also filed the following further answer and motion.

" Now the respondents, notwithstanding the finding of the committee in this cause, here in court deny that the erection of said dam is or will be of or for public use ; and respectfully request, according to the statute in such case made and provided, that the court shall inquire for itself, whether the erection of said proposed dam is or will be of or for public use."

The superior court (*Pardee, J.,*) overruled the remonstrance and accepted the report, and passed a decree authorizing the petitioners " to raise said dam as reported by said committee, so as to raise the water of said Paug Pond three feet higher than the same would be raised by said dam as it stood on the 23d day of February, 1865, and so as to flow the lands of the several petitioners to the extent described in the petition ; and that said dam may be kept at said increased height from the first day of April in each year till the first day of December in each year, and shall be kept at said increased height, with its gate shut, the remaining portion of each year."

With regard to the raising of the dam being of public use, the court found " that the raising of said dam in the manner and

to the extent recommended in the report of said committee,
will furnish such increased quantity of water for the use of
the several mills on Stony Brook, which are described in de-
tail in said petition, as will enable the owners thereof to ope-
rate them during portions of the year in which they cannot
now be operated by reason of an insufficient supply of water,
and will thus increase the power, value and usefulness of said
several mill privileges, and therefore is of public use ; which
fact is found upon evidence the whole of which was objected
to by the respondents."

With regard to the parties being unable to agree as to the
damages to be paid, the court found that the petitioners, prior
to the bringing of the petition, asked the respondents William,
Joel and Horace Austin, to state the price for which they
would convey to them the right to flow so much of their land
as would be covered by water in consequence of raising the
water in the pond to the various heights of two, three and
four feet, above the point to which it could be raised by the
dam then existing at the outlet of the pond ; in reply to
which they stated certain terms which the petitioners were
unwilling and refused to accept; and these respondents made
no other proposition. Also that the petitioners applied to
the respondent Elliott to state to them the price for which he
would convey the right to flow his land, by raising the water
in the pond three feet higher than it could be raised by the
dam then existing ; to which he declined to make any answer.
The court thereupon found that the petitioners were unable
to agree with the respondents, or either of them, as to the
damage, or as to the judgment that should be rendered.

The respondents brought the record before this court by a
motion in error.

*H. B. Harrison*, with whom were *Blackman* and *Elliott*, for
the plaintiffs in error.

1: The flowage act is unconstitutional. It is not within the
constitutional power of the General Assembly to authorize,
directly or indirectly, one man to take and appropriate to his
private use (either with or without compensation,) the prop-

erty of another. *Varick v. Smith*, 5 Paige, 137, 159 ; *Matter of Albany Street*, 11 Wend., 148 ; *Wilkinson* v. *Leland*, 2 Pet., 627 ; *Hay* v. *Cohoes Co.*, 3 Barb., 47 ; *Hartwell* v. *Armstrong*, 19 Barb., 166 ; *West River Bridge* v. *Dix*, 6 Howard, 544 ; *Bradley* v. *N. York & N. Haven R. R. Co.*, 21 Conn., 305 ; *Norwich Gas Light Co.* v. *Norwich City Gas Co.*, 25 id., 19, 38 ; *Woodruff* v. *Neal*, 28 id., 169 ; *Taylor* v. *Porter*, 4 Hill, 140 ; *Clack* v. *White*, 2 Swan, 540 ; *Sadler* v. *Langham*, 34 Ala., 311 ; *Harding* v. *Goodlett*, 3 Yerger, 41 ; *Commonwealth* v. *Sawin*, 2 Pick., 548, 549 ; *Commonwealth* v. *Cambridge*, 7 Mass., 158, 167 ; Constitution of Conn., Art. 1, secs. 8, 9, 11, 12, 21. The reasoning by which courts in certain states have sustained the mill acts of those states, does not apply in support of this law. The mill acts of Massachusetts, for instance, rest upon peculiarities of the common law of that state in relation to the rights of proprietors of land traversed by mill streams ; peculiarities directly in conflict with the common law of England and of Connecticut. *Murdock* v. *Stickney*, 8 Cush., 116 ; *Bates* v. *Weymouth Iron Co.*, id., 548 ; *Jordan* v. *Woodward*, 40 Maine, 322 ; *Williams* v. *School District*, 33 Verm., 278 ; *Newcomb* v. *Smith*, 1 Chandler, 71 ; *Ingraham* v. *Hutchinson*, 2 Conn., 590 ; *King* v. *Tiffany*, 9 id., 168 ; *Buddington* v. *Bradley*, 10 id., 218 ; *Parker* v. *Griswold*, 17 id., 288 ; *Thurber* v. *Martin*, 2 Gray, 394 ; *Thompson* v. *Crocker*, 9 Pick., 59 ; Angell on Watercourses, § 340.

2. At any rate, the act, if constitutional, " steps to the verge of the constitutional limit," and must be construed with the utmost rigor against those who try to seize property under it, and in favor of those whose property they try to seize. No proceeding under it should be sustained unless it is brought within both the letter and the spirit of the act. *Nichols* v. *Bridgeport*, 23 Conn., 208 ; *Jordan* v. *Woodward*, 40 Maine, 322 ; *Williams* v. *School District*, 23 Verm., 278. This case does not come within either the letter or the spirit of the act. The act provides only for those cases where the mill and the dam are on the " same " piece of land and under the control of the same person. It does not authorize, or intend to au-

thorize, any petitioner to flood the land of a respondent, except in a case where the petitioner possesses the right of turning to some use the privilege seized by him under the act. If the mill is separated from the dam by land not owned or controlled by the petitioner, then the petitioner, after raising his dam to the injury of the respondent, will not be able to apply to his mill the water thus obtained. Such is the present case. It is certain that so long as the state of facts apparent on the record exists, so long it will be impossible for the petitioners to put to the use of their mill the water-power which they seek by seizing our property to obtain. The proposed seizure of our property, therefore, cannot be justified under any pretext of public advantage, and cannot be within the purview of the act. The act, if constitutional in other respects, would be clearly unconstitutional if it had extended to cases like this, authorizing one man wantonly to take another's property, without having the power to use it after getting it. The words " on the same," in section 388, were accordingly introduced for the express purpose of preventing the act from applying to cases like this. *Farrington* v. *Blish,* 14 Maine, 423 ; *Murdock* v. *Stickney;* 8 Cush., 117 ; *Bates* v. *Weymouth Iron Co.,* id., 552.

3. It is not properly found, within the true intent of the requirement of section 388, that the petitioners could not " agree " with the respondents " as to the damages to be paid."

4. The record does not " show with certainty the matter " that has been " determined," within the true intent and meaning of the same section.

*Watrous* and *Rogers,* for the defendants in error.

McCURDY, J. The principal point raised in this case, the constitutional question, was decided after full consideration in the case of *Olmstead* v. *Camp,* 33 Conn. R., 532. But as the question was one of great interest, and it was suggested that new views might be presented bearing especially on the

Todd *v.* Austin..

particular facts of this case, a very elaborate argument was again listened to by the court.

It was claimed that in Massachusetts, where the flowage laws were said to have originated and where they have been more frequently discussed and sustained than in any other state, principles in relation to the rights of mill-owners and riparian proprietors have been recognized as a part of their common law somewhat different from those which exist in this state and elsewhere.

However this may be, we do not understand that in that state or in any other of the many which have enacted and upheld such laws, their defence has been placed upon any peculiarity of their common law. They are every where justified upon the broad ground of a paramount right of the government to take private property, upon making compensation, in cases of necessity or great public utility. It is this general authority, which, in the opinion given in the case referred to, we have endeavored to explain and sustain by considerations which seemed to be appropriate. We see no occasion to change the views then expressed.

But it is urged that the statute provides only for a dam to be raised on the land of the mill-owner or that of another by his consent, and if it is erected on the land of the mill-owner it must be on the identical tract on which the mill stands; and it appears in this case that the dam stands on a lot of the petitioners separate from the mill-site ; the land of another person lying between the two tracts. We are unable to see any force in this objection. The object of the clause relied on is to require that the dam shall be built on a site where the owner has a right to place it. This right may result from his own ownership or from an agreement with the proprietor. The words " on the same " refer to the antecedents, " his own land " or " land of another." There is no conceivable reason for requiring the mill and the dam to be on precisely the same tract.

The respondents further object that it does not sufficiently appear that the parties were not able to agree in relation to the damages. This is a question of fact, and the superior

court has found that they were unable to agree. If it were proper to re-examine the question we should conclude that the evidence abundantly justified the finding. The petitioners called on the respondents to state their terms for the privilege of flowing. One party made no answer, and the other named so large a sum that the proposition was rejected.

Another objection to the report of the committee is, that they do not establish with sufficient certainty the height to which the dam may be raised. It would unquestionably have seemed more definite if they had established the height by marks upon a rock, or pillar, or some other permanent object. But we have a right to presume that the height to which the petitioners were entitled was well known and established by some such mark, and the committee taking that for their basis allow a certain number of additional feet.

We see no error in the proceedings, and the decree is affirmed.

In this opinion PARK, J., concurred.

BUTLER, J. I was fully satisfied at the conclusion of the argument in *Olmstead* v. *Camp*, (33 Conn., 532,) that the flowage law was sustainable upon strict and recognized principles of constitutional law ; and a re-examination of the question has confirmed rather than shaken that opinion.

Like every other question of constitutional power exercised by the legislature under our state constitution, it presents itself to the mind in a three-fold aspect, and logically involves a three-fold enquiry.

First—Whether the power exercised is delegated by the people to the legislature in and by the constitution specifically, or by a general grant of power sufficiently comprehensive to embrace it.

Second—Whether the exercise of the power as exercised conflicts with the constitution and laws of the United States, or with any other provision of the constitution of this state. And,

Third—Whether the exercise of the power in the particular case and manner is contrary to natural justice. For, as it

is to be conclusively presumed that the people, while possessing the power, would not have exercised it contrary to that fundamental principle of the social compact, it is in like manner to be presumed that they did not intend to delegate and have not delegated the power so to exercise it to the legislature. An unjust use of the power is therefore an abuse of it and void.

We come then to the application of these enquiries to the case in hand. And first,—What is the power which has been exercised, and is it delegated in the constitution?

The power exercised is the right of eminent domain, which is a part of the legislative power, and is unquestionably delegated in the first clause of the third article of the constitution. This right is a paramount right attached to every man's land, and he holds it subject to its exercise. Bouvier defines it to be the right which the people or government retain over the estates of individuals to resume the same for public use; and that definition is sufficiently comprehensive and in accordance with the authorities.

2. The law in question does not conflict with the constitution or laws of the United States, or any provision of the constitution of this state. There is a clause in the bill of rights requiring just compensation to be made when the power is exercised, and as a condition of its exercise. Much misconception has prevailed in relation to the nature of that clause, but it is simply a condition attached to the exercise of the right of eminent domain. It does not purport to be a grant of power, but recognises its existence. Its import is precisely what it would be if the language used had been, "the right of eminent domain shall not be exercised unless just compensation be made for the property taken." The convention which framed the constitution of 1818 was composed of very able men, many of them distinguished jurists. They framed a constitution remarkably concise, clear and unambiguous. Whatever they intended to say they said, and in simple language, so that it could be understood by the people. They knew, when they provided that the whole legislative power should vest in the legislature, that the right of eminent do-

main would vest as a part of it, and they did not except it. They therefore intended it should vest. So when they framed the condition to be attached to its exercise, they did not use the words " eminent domain," for those words would not have been intelligible to the people, but they did use the precise language employed by jurists to define and describe that right. It is evident therefore that they intended to attach the condition to the *exercise* of that right merely, and there is not in that clause, or anywhere else in the constitution, ground for suspicion even, that they intended to define or limit in any way or manner the right itself. The law in question complies with the condition and is not in conflict.

3. The principal objections to the law are founded on the assumption that it is contrary to natural justice. I am satisfied that it is not. The right to take private property for public use, or of eminent domain, is a *reserved* right attached to every man's land, and paramount to his right of ownership. He holds his land subject to that right, and cannot complain of injustice when it is lawfully exercised. The right consists of two elements,—the right to take, and the right to judge of and determine the exigency and the necessity for taking it. These are both and equally vested in the legislature. Bouvier, (Law Dictionary,) says, " It belongs to the legislature to decide what improvements are of sufficient importance to justify the exercise of the right of eminent domain." And the authorities cited fully sustain him. It is for the legislature therefore to determine what is required by the wants of the people, or for the public good, in the exercise of a sound discretion. With the *bona fide* and not unreasonable exercise of that discretion courts cannot interfere. As the legislature in this case have exercised their discretion honestly, deliberately, and after much agitation of the subject, and the law is confessedly beneficial to the public interest, there would seem to be no question about its constitutionality.

But several objections are made on the ground that the right is limited to actual governmental or individual *use*, and they must be fairly examined.

The objections are made in various forms, but they may all

be resolved, substantially, into two classes. The first class of objectors ignore entirely the fact that the right of eminent domain is granted in the constitution as part of the legislative power, and assume the grant to be by the clause in the bill of rights; and further assume that every man is the absolute owner of his property, and that the grant is an invasion of that ownership; and then argue that the grant is in derogation of common right, and to be strictly construed; and therefore that the terms " public use " should be construed to be a use by the government, its officers and agents only. As this objection is founded on an ignorance of the existence of the right of eminent domain in the legislature independent of the clause in question, a false assumption in relation to the character of that clause, and a false assumption as to the absolute ownership of the property, and is wholly unsupported by authority, it is entitled to no consideration.

The second class of objectors concede the right of eminent domain in the legislature, but claim that the clause in the bill of rights is an implied prohibition against taking the property for any other purpose, and that the words " public use " must be construed to mean an *actual personal use* by the government or by individual members of the public. I do not think the claim that the clause in the bill of rights contains an implied prohibition is correct, or see its materiality if it is. It is the essence of the right of eminent domain that the property shall be taken " for public use," and the question remains open, what is the meaning of the words, and who is to determine what constitutes such use, whether there be such a prohibition or not.

But suppose it admitted that some actual use by the public is essential to the just exercise of the right of eminent domain, the law will still be constitutional.

This class of objectors concede that grants of rights of easement to railroad companies, water companies for the distribution of water in cities and villages, and gas light companies, are constitutional, because they say the public use them. But let us see what use the public make of them. · *A* takes his goods to the railroad, pays the freight to their place of destina-

tion, places them in the cars, or they are placed there by the employees of the company, and they are transported pursuant to his contract. Now to have the use of a thing in the sense in which the objectors use the words, is to have some exclusive occupation and control of it. What use or control has *A* of the road, its equipments or operation, by reason of the fact that he has shipped his goods upon it ? None whatever. If he can be said to use anything it is the *transportation*, the *result* or *product* of the use and operation of the road and its equipments by the company. Nor is the case different if he applies for transportation for himself, except in the deceptive particular that, being animate and having the power of locomotion, he is expected to place himself upon the train instead of being placed there by the employees of the company. In all other respects he is as much the *passive recipient of transportation,* as the result or product of the operation of the road, as his inanimate goods. So too of the water power company. The public have no use of the franchise or structure, nor control of its operations. All they have is the use of the water delivered to them by the operation of the structures as used and controlled by the company. The same is true of the gas-light company.

The following proposition then may be deduced from the three instances alluded to and conceded to be constitutional, viz. :

The legislature may lawfully grant rights of easement to individuals or corporations to enable them to erect and operate structures, if the result of their operation is the production of an article or thing intended to be furnished or sold to the public for a beneficial use, and to supply their reasonable wants.

This proposition covers the case in hand as perfectly as it does either of the other three, for the flowage law is intended to grant rights of easement which will enable individuals or corporations to enlarge or erect and operate structures, the result or product of the operation of which will be articles, (such as cotton or woolen cloth and the like) intended to be sold to the public for their necessary and beneficial use.

Todd *v.* Austin.

And if there be any element of public use in the other cases or either of them, it is contained in the law in question, and it is constitutional upon the principles claimed or conceded by this class of objectors.

But there is no *such* limitation, nor *any* specific limitation to the *bona fide* exercise of their discretion by the legislature, known to the law. The cases cited from Judge Kent are not cases of limitation, but of arbitrary power, exercised pretendedly and fraudulently, under cover of the right. If the true nature of the right of eminent domain, and the true object and operation of the clause in the bill of rights are regarded, all difficulties vanish ; and I have yet to hear or read the first argument or opinion adverse to the law in question, having any plausibility, which was not founded on a misconception of one or the other. A distinguished judge, even, speaks of the taking and grant " as a forced sale ;" but if such were their character they could not stand an instant. The legislature cannot compel one man to sell to another. The true theory and principle of the matter is, that the legislature *resume* dominion over the property, and having resumed it, instead of using it by their agents, to effect the intended public good, and to avoid entanglement in the common business of life, they re-vest it in other individuals or corporations, to be used by them, in such manner as to effect directly or indirectly, or incidentally as the case may be, the public good intended. And it is perfectly immaterial to the owner of the property in what manner the legislature use it or cause it to be used after they have resumed it and he is justly and fully compensated. He has on that account no ground for complaint. Upon the strictest principles, therefore, I consider the law constitutional.

Upon the other points I also concur with the majority of the court.

CARPENTER, J., concurred in both the foregoing opinions. HINMAN, C. J., dissented.