# BALTIMORE CITY COURT

Filed June 16, 1893.

BALTIMORE BELT R. R. CO.

## VS.

THE BALTIMORE TRACTION CO. AND THE MERCANTILE TRUST AND DEPOSIT CO.

*Wm. A. Fisher* and *J. Irvine Cross* for Belt R. R. Co.

*Morrison, Munnighuysen & Bond* and *Bernard Carter* for Traction Co. and Mercantile Trust and Deposit Company.

WRIGHT, J.—

The exceptions relied on and which have been discussed by counsel in these proceedings, are substantially as follows:

1st. That it appears on the face of said proceedings; that the Baltimore Belt Railroad Co. did not make application to the magistrate for the issuing of the warrant as provided in Art. 23 of the Code of Public General Laws of this State.

2d. That it appears on the face of the proceedings that it was not proven or shown before the magistrate that the said Belt Railroad Co. has failed to agree with the owners of the property condemned, and that therefore said magistrate had no jurisdiction to issue the warrant, and because said railroad company offered no proof at the time of taking the inquisition before the jury to show that it had failed to agree with the owners of the property condemned.

3d. That the land sought to be condemned was greatly more than was necessary for the proper construction of the roads of the railroad company.

4th. That the damages found by the jury in their inquisition were grossly inadequate, and that the finding in said inquisition was against the great weight of evidence submitted to the jury.

There were other exceptions filed, but they were not discussed before me, and I understand that they have been waived or abandoned.

It is difficult to state my conclusions and the reasons for the same very briefly, in consequence of the wide range of the discussion; I shall endeavor to do so as briefly as possible. Before, however, considering the questions discussed it will perhaps be well to see what is the duty of the Court in the matter. It is that if no sufficient cause to the contrary be shown the inquisition shall be confirmed by the Court; in other words, the inquisition as returned shall stand unless sufficient cause be shown to set it aside.

As to the first exception or first class of exceptions, they seem to relate chiefly to a formal defect alleged to be apparent on the face of the proceedings, and it is insisted that it is shown thereby that application was not made to the justice of the peace as provided for by law; that it does not appear that there had been a failure to agree, and further an objection that the railroad company offered no evidence before the jury that there had been a failure to agree. This objection, although not formal, I shall consider in connection with those that are formal.

It is objected first, that the signing of the application to the justice of the peace by the attorney of the railroad company was not such a legal signing of the same as is required by law; that it should have been signed by some officer or agent specially authorized, and also because strictly there should have been affidavit to the application.

In considering the question whether or not an application signed by an attorney is a sufficient signing, I am convinced, as I stated at the hearing, that the ruling of the Court of Appeals in The Mayor and City Council of Baltimore vs. Ritchie, 51 Md. 243, 245, settles this point. It was there held that a condemnation proceeding, practically the same as the pending one, is a strictly legal form of proceeding recognized by our laws and Courts, and that it cannot be *initiated* or conducted with-

out the aid of an attorney and solicitor learned in the law, and that all of the proceedings prior to the final order of the Court are ancillary and preliminary thereto. By this decision the Court decides in effect that a condemnation proceeding is a case or suit in Court, and, this being so, and the application to the justice of the peace being but preliminary and ancillary to such suit, I think that the signing of the same by the attorney was regular and legal and all that was necessary.

As to the claim that an affidavit is necessary to such an application, I will only say, in the language of the Court in Tidewater Canal Company vs. Archer, 9 G. & J. 505, 506,, "It is a sufficient answer to say that there seems to be nothing in the statute requiring that the inquisition should set forth, contain or purport any of those matters." I think, on the contrary, after considering the many authorities cited by counsel on both sides, that if it appears from the whole evidence that there had been a negotiation and that the result of such negotiation and the circumstances attending it were of such a character as would satisfy a reasonable mind that there was no reasonable prospect of an agreement, then the law has been complied with in this respect (Lewis on Eminent Domain, Sec. 302; Williams vs. Hartford and New Haven R. R. Co., 13 Conn. 397-410; Matter of Prospect Park and Coney Island R. R. Co., 67 N. Y. 371-377; Trinity College vs. Hartford, 32 Conn. 481; Todd vs. Austin, 34 Conn. 78, 85, 86; Burt vs. Briglam, 117 Mass. 307; Biglow vs. The Miss., Cont. & Tenn. R. R. Co., 2 Head. 624-626). It is but proper to say that there are also strong cases which were cited by the counsel for defendant, which take a contrary view, but I have followed those above cited because they fully meet the requirements of the language of our statute, and also because, as far as I have been able to discover, this has been in this State the universal practice up to this time, and never before these exceptions were taken can I find that such an objection was ever made. When I see, therefore, that authorities entitled to the highest respect have decided the question in accordance with what has been the practice in our own State, I do not feel that I should be justified in deciding that those authorities and that practice are erroneous.

Is there then such evidence of negotiation and of inability to agree as should satisfy this Court in that respect? It is proper here to note the language of the statute. Sec. 167, Art. 23, Public General Laws, provides that "The said president and directors, or their agent or agents, may agree with the owner or owners of any land, earth, gravel, &c., which may be wanted for the proper construction or repair of any such roads, or any of their works, for the purchase and use and occupation or division of the same; and if they cannot agree," &c. Now, while we may think it most remarkable that the people of this State should for so long a time have acquiesced in a statute drawn in the terms of this whole section remaining on the statute book, the Courts must take the law as they find it; and, taking the plain language of this section, I am satisfied that from the facts developed by the evidence in this case, it would be contrary to common sense to hold that it does not sufficiently appear that after negotiation there was no reasonable probability of an ability to agree between the parties interested. Stated in brief, the evidence is that Mr. Frick, as agent of the railroad company, approached Mr. Hambleton, the president of the Traction Company, and entered into a negotiation with him for the purchase of a lot of ground through which it was desired to run or locate this railroad. It is true that the only positive offer shown to have been made by Mr. Frick was an offer to exchange another lot of ground for the lot desired by his company, and it is also true that the lot negotiated for was much larger than the lot now sought to be condemned; but it is also true that the views expressed by Mr. Hambleton show that it would have been utterly futile to continue the negotiation for that part of the lot sought to be condemned in these proceedings, which, according to the evidence of Mr. Hambleton and other witnesses on behalf of the Traction Co., contains so much of the railroad front that the remaining part of that front would be rendered practically unavailable and worthless to the balance of the large lot owned by that company. Says Mr.

Hambleton, on p. 167 of the testimony before the Sheriff's jury: "I told him (Mr. Frick) that I would not part with the railroad front at all unless I sold the whole property; if I could hold it I would not part with the railroad front at all." Question—"Unless you sold the whole property?" Answer— "Unless I sold the whole property." And on page 106 of the testimony taken before the Court, Mr. Hambleton says: "I told Mr. Frick that we were not disposed to sell *any part* of this front unless we could get him to buy the whole of it—that it would destroy the value of our property. Mr. Frick then talked of condemning it. I told him I had been advised by counsel that he could not condemn that extent of property—the piece shown me." With great respect for the learned counsel who so earnestly argued this case, I must state that it is impossible for me to say that the evidence of Mr. Hambleton himself does not show that it would have been futile and idle for the negotiations to have been continued. That evidence, if it shows anything, that Mr. Frick had a right to believe from Mr. Hambleton's own statements that there could be no agreement arrived at unless Mr. Frick would agree for his company to take the whole of the large lot of land owned by the Traction Company, which the railroad company did not need. As justly said by the counsel for the plaintiff, we might as well say that, where one desires to buy one house in a block, and is told by the owner that he will not sell him one unless he buys the whole block, there is no inability to agree, as to say so in regard to the facts developed in this case. The whole available railroad front (according to the evidence on behalf of the Traction Company) is to be taken by these proceedings. Mr. Hambleton had refused to part with it, or had used language that justified Mr. Frick in believing that he refused to part with it, except on such terms as Mr. Frick would not accept, and what good purpose could have been subserved by continuing a useless negotiation I cannot conceive. Had Mr. Frick, when negotiating for the much larger piece than the lot sought to be condemned, received any intimation that, although the Traction Company would not sell the piece negotiated for, but would sell what might be absolutely required by the railroad

company, or had not language been used by the president of the Traction Company that demonstrated the utter futility of further attempts to negotiate, it might with some reason be said that there had been shown no inability to agree, but the language actually used satisfies me, as it seems to have satisfied Mr. Frick, that further attempts to come to an agreement would be useless.

In regard to the point raised that there was no attempt to purchase the right of way, but only the land itself, I can only say that, taking this for granted, it still seems to me that the plain provisions of that statute have been complied with.

The next question urged is that the land sought to be condemned is greatly more than is necessary for the proper construction of the roads of the railroad company. This object is urged because it is claimed that the railroad company is seeking to condemn land enough for the location of four tracks, while the act under which it was incorporated only authorizes a single or double track road. This objection appears to be the same as that urged before and decided by Judge Ritchie in the Turner case, unless it should appear that the two additional tracks objected to are not in any sense sidings or side tracks.

As stated by Judge Ritchie, "The law upon this point in respect to the quantity of land needed seems to be that the Court will accept as satisfactory evidence the statement of the proper officers of the company, if it has a reasonable appearance of accuracy and the company seems to be acting in good faith."

It must be borne in mind that the Court of Appeals, in O'Brien vs. Baltimore Belt R. R. Co., 74 Md. 163, 372, has decided that this "company was authorized to construct such part of its road in a tunnel as should be found necessary; and the grant of that power carried with it by reasonable implication all that is necessary and proper for the exercise of that power." Bearing this language in mind, we find on page 83, in the testimony of Mr. Odell, General Manager of the B. & O. R. R. Co., the following language in regard to the necessity of the four tracks between the northern part of the tunnel and Huntington avenue: "It will be

*absolutely necessary* for the safe handling of the business to have four tracks running from a point as near the north end of the tunnel as it is possible to get, and extending to the top of the hill, which is Huntington avenue, not so much for the volume of business particularly as for safety." I mention this evidence here to show the spirit with which this question should be approached. The uncontradicted evidence is that the safety of the travelling public demands these two additional tracks between the points mentioned, and no Court could under such a state of facts hesitate to say that the placing of tracks there can be nothing more or less than the proper exercise of a right existing in the company (as the grant of the power to construct the road "carried with it by reasonable implication all that is necessary and proper for the exercise of that power") unless there should appear to be a positive and clear violation of the law by the company in thus locating the two additional tracks. I do not find any such violation of the law. They are indeed to be found some expressions made use of by Mr. Odell that would make it appear that the two tracks here added to the road in connection with the two main tracks would, between the tunnel and Huntington avenue, make the road a four track road; but taking his testimony as a whole, after a careful rereading of it, I feel satisfied that the two additional tracks are what Mr. Odell says they are, "passing sidings." In answer to a question as to whether there is such a thing as a "passing siding," Mr. Odell answers, "Yes, sir." Question—"What is that?" Answer—"That is exactly what this is for, a passing siding; it is a track that is always free from cars and used in the same manner as the main track is used—exactly as these would have to be; these would be passing sidings used as continuous tracks; there are passing sidings and loading sidings." He then explains that a loading siding is a side-track for placing cars upon for loading purposes. The difference between the two being, as I understand, that a passing siding is one kept open and unobstructed for the passage of trains from one point on the main track to another point on the same track; the "loading siding" being one on which cars are allowed to re-

main standing for the purpose of loading. The testimony of Mr. Bott also, I think, shows that the engineers engaged in the construction of the railroads have arranged and located these two additional tracks as *sidings*, and the fact that all freight trains may use two of the tracks and passenger trains the other two, either for safety, or the more convenient handling of the business of the road, does not, in my opinion, change the character of the tracks. If they are what are known as "Sidings," they can be legally placed there by the company. The road has the right under the law to reach the point where the four tracks are intended to be located by means of a tunnel; arriving at that point their officers testify that it will be necessary for the safety of the travelling public that these two additional tracks shall, for the distance mentioned, be placed as "passing sidings." I think that this power to thus lay these tracks by a "reasonal implication" follows, as being necessary and proper for the exercise of the express powers granted to the company. Having reached this conclusion, it is unnecessary to discuss what effect, if any, the Act of 1890, and the city ordinance passed under that act, have upon the question.

The next and last objection discussed before me is the one relating to the inadequacy of the d a m a g e s awarded.

In considering this objection I will state that although I am fully impressed with the importance and justice of the proposition that the owner of property taken under proceedings of this character should obtain a fair market price for the same, I must however also take notice that the law, as construed by the Courts, does not allow any more than this price and such incidental damages as may result to other portions of the same tract of land by the taking of the part sought to be condemned; and I conceive that the damages thus sustained must be such as affect the *present value* of the land not taken. It can hardly be contended that damages should be allowed because the future value of the land (without regard to present value) might be affected in one, five, ten or twenty years. Were such speculative damages to be allowed, it seems to me,

that it would be impossible by condemnation ever to obtain a piece of ground at any reasonable fair price.

After giving to this question considerable time, and after a careful examination of the evidence, I have come to the conclusion that the whole matter was fully and fairly submitted to the jury, and I can find no sufficient cause for disturbing the verdict.

The jury gave about two thousand dollars more than the highest valuation made by the expert witnesses examined on behalf of the railroad company, and I cannot, from the evidence before the jury and that given also before me, say that they did not give enough.

In regard to the valuation of land taken under proceedings of this character, I think that the rule is fairly laid down in an Arkansas case, expressing, as it does, in a few words, the rule as I understand it is to be in this State. (Little Rock J. R. R. Co. vs Woodruff, 49 Ark. 381). Says the Court in that case: "The owner is entitled, not simply to such sum as the property will bring at a forced sale, but to such sum as the property is worth in the market—that is to persons generally—and in ascertaining that value it is not proper to add a value to the land because it is indispensible or necessary to a railroad company." The value is such sum as it is worth in the market, to *persons generally.* To arrive at this value it would seem that those persons whose business it is to buy and sell land for others, and whose interest and duty it is to investigate land values in the community where they carry on their business operations, would seem to be the persons, above all others, whose evidence should be most valuable on this point. A good deal has been said about the worthlessness of such evidence, and in many cases the differences in opinion shown by such experts called as witnesses on different sides of a controversy have given good grounds for dissatisfaction, and if such differences were shown here I might feel obliged to pay no attention to such evidence, and to seek elsewhere for the true value; but in the proceedings now under consideration the real estate agents or brokers examined were prac-

tically in accord so far as their evidence affect this verdict, the jury having, as I have said, allowed nearly $2000 more than the highest estimate of value given by any of these experts. Their estimates were from $3,500 to $5,800 and after their attention was specifically called to the "railroad front" they still held to these estimates.

The witnesses examined on the part of the Traction Company were very far apart, their estimates ranging between $15,000 and $30,000. Many of these witnesses are gentlemen of the very highest character in the community, and without the slightest doubt they gave their opinions in the utmost good faith, but the extremely wide divergence in their views, and the reasons given for these views, have convinced me that their estimate were based, not on what is now the fair market value of the property, but on the belief that at some future time a very large price might probably be obtained for the same. And the estimates of damages sustained by the portion of the property not taken were, as it appears to me, based on a future, and at present unascertainable loss, when that portion might be sold without the part bounding on the Northern Central Railway. The only purchaser of property who had, within the memory of the witnesses, ever paid any sum approaching these estimates of value, had been the Northern Central Railway Company, which had purchased two lots of ground on the north side of North avenue. It has been the only purchaser at such prices, and a view of the property thus purchased and the use made of the same, has convinced me, and should, I think, convince any one that it has a peculiar value to that railroad company much in excess of what might in any fair sense be termed the *market value,* or what it would be worth to persons generally (it having been purchased to increase the yard room, as it adjoined a railroad yard); and unless it were shown that that railroad company is in the market as an intending purchaser for more land in that locality that it now has of the character thus purchased by it, and the price which it is willing to pay for the lot described

in these proceedings, or was willing to pay at the time of the institution of these proceedings, the prices paid for the land on the north side of North avenue by said company cannot in any way fix the present fair market value of this land. There is no evidence that that company is desirous of making further purchases, and from the evidence of one of the real estate brokers who had in his hands for sale the larger and most valuable piece purchased, it would appear that it took six or seven years to make the said sale to said railroad company. Mr. Wilkins, the general agent of the Northern Central Railway Company, does indeed say that he regarded the lot sought to be condemned "as one of the best pieces of property to work up for our road in this city," and if his company had been shown to be an intending purchaser of this property, and if Mr. Wilkins had testified before the jury that at that time he would, for his company, have given a price approximating any of the estimates of value given by defendants' witnesses, it would have or should have, convinced the jury and would now convince me that the award is too low, but the mere fact that he considered it one of the best pieces of property in the city to work up for his road, can have a little weight on the question of present fair market value. "Work up—when and how? This evidence is too indefinite and vague to form any basis of present value. And without going at length into the other evidence, I think this same objection applies to the opinions of the other witnesses for the defendant, and unless the value as given by the plaintiff's witnesses is the approximate value of the property, I can see no other evidence at all satisfactory upon which to base a reasonable opinion of that value.

After the most careful examination that I could give to this case, and governed by the weight of the evidence as I comprehend it, I can discover no good cause why the verdict of the jury should be set aside in consequence of the sum awarded being too small; and having arrived at the conclusion that the other objections urged and hereinbefore considered, would not justify me in setting said verdict aside, I shall sign an order confirming the award.